DOROTHY FOSTER, Adm'r of the Estate of Vercey Lee Foster, Deceased, Plaintiff-Appellant-Appellee, *v.* ENGLEWOOD HOSPITAL ASSOCIATION *et al.,* Defendants-Appellants—(EVELYN P. HAUSMAN *et al.,* Defendants-Appellees.)

(No. 57246;

First District (1st Division)—May 20, 1974.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (John M. Moelmann, D. Kendall Griffith, and Stanley J. Davidson, of counsel), for appellants.

James T. Demos, of Chicago (William J. Harte and Philip Rock, of counsel), for plaintiff-appellant-appellee.

Bernard E. Harrold and Kevin T. Martin, both of Wildman, Harrold, Allen & Dixon, of Chicago, for defendants-appellees.

Mr. PRESIDING JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Dorothy Foster, as administrator of the estate of Vercey Lee Foster, brought an action for wrongful death against the defendants, Englewood Hospital Association, Grace Meyer, a nurse, and Evelyn P. Hausman and Continental Illinois National Bank and Trust Company, co-executors of the estate of Dr. Charles Hausman, who died prior to suit. The plaintiff alleged that the negligent medical treatment by one or more of the defendants or Dr. Hausman was a proximate cause of death.

A jury returned a verdict in favor of the plaintiff against all defendants in the amount of $300,000. The court granted Hausman's estate's motion for judgment notwithstanding the verdict, but the post-trial motions of Grace Meyer and the Englewood Hospital Association were denied.

The plaintiff has appealed from the judgment notwithstanding the verdict in favor of Hausman's estate, and the defendants Grace Meyer and the Englewood Hospital Association have appealed from the judgment in favor of the plaintiff. The plaintiff contends that the trial court erred in entering judgment notwithstanding the verdict in favor of Hausman's estate because there was sufficient evidence demonstrating Dr. Hausman's negligence.

The only error assigned by the defendants Meyer and Englewood Hospital is the denial of their motion for a new trial which was based on an evidentiary ruling.

On July 23, 1969, Vercey Lee Foster injured his shoulder while playing football in a park near his home. The following morning he was admitted to the emergency room at Englewood Hospital. The first physician to examine him was Dr. Francisco Hernandez, who conducted a complete physical examination which revealed a possible dislocation of the left shoulder. Thereafter, Dr. Hernandez called the attending surgeon of the day, Dr. Henry Pimentel, who ordered X-rays. Dr. Pimentel conducted an examination and arrived at a diagnosis of a shoulder separation. Both doctors determined that Foster was otherwise healthy and normal, and surgery was prescribed.

The defendant, Grace Meyer, is a qualified anesthetist, who first saw Foster in the operating room the following day. He was brought in on a cart and appeared to be a little apprehensive. She had worked with Dr. Hausman many times before.

She began an intravenous solution of sodium pentothal into Foster's right arm at 10:25 A.M. The solution was mixed the previous Monday, but she did not know who mixed it. The dosage was given at one time,

slowly, to observe the loss of lid reflex. The manufacturer of sodium pentothal recommends a test dosage, then a 60-second pause to observe the affect on the patient. She did not wait 60 seconds to watch the reaction. She gave him a larger dose because he was apprehensive. She then replaced the pentothal with a solution of dextrose in water. After that the patient received another anesthetic—penthrane, nitrous oxide and oxygen. A muscle relaxant, anectine, was also administered, after which she opened his mouth and placed a tube into his trachea. The patient then received penthrane, nitrous oxide and oxygen through the tube from a machine. After this was done, Dr. Hausman draped the patient from head to toe, leaving an opening for the surgery. The operation began at 10:35 A.M. and was completed in 15 minutes. Dr. Lontok and Dr. Villafria assisted Dr. Hausman.

Before and during the operation Meyer recorded Foster's blood pressure. It was as follows: at 10:20—150/80 with a pulse of 92; at 10:30—120/50 with a pulse of 90; at 10:40—120/50 with a pulse of 88; at 10:50 —110/50 with a pulse of 88; at 11:00—100/50 pulse not recorded. Meyer first assisted the patient's breathing when she started the anectine at 10:25 A.M. He was breathing spontaneously, but shallowly, during the course of the operation, and she was assisting him by hand manipulation of the bag on the anesthetic machine. At 11 A.M., he was not breathing, and she was assisting him by totally controlling his aspiration. At 11:05 A.M. the operation closed, the patient's breathing was totally assisted, and Dr. Hausman left the operating room. From 11:05 to 11:10 Meyer continued controlling Foster's respiration, giving him oxygen. She then asked another nurse if a Bennett resuscitating machine was available in the recovery room because the Bennett gives better respiration than the hand controlled bag.

At 11:10 A.M., Foster's respiration was totally paralyzed. Meyer disconnected the anesthetic machine from the intubation tube. Foster was lifted from the operating table onto a cart. He still had the endotracheal tube in his mouth, and Meyer controlled his respirations with a high percentage of oxygen. She gave Foster an excess of the required amount of oxygen and then controlled and forced the respiration in order to build up a higher concentration of oxygen in the bloodstream. Meyer testified that this amount of oxygen would serve him for three minutes. The endotracheal tube was taken from Foster's mouth, and he was wheeled to the recovery room about 50 to 75 feet down a straight corridor. It took a minute or less to wheel him there. During the trip Foster's lungs were completely paralyzed, and he was not breathing.

Meyer connected the patient to the Bennett machine at which time his blood pressure was 80/50. This was the first time that she realized

Foster was in serious difficulty. Foster's pulse could not be detected at 11:10 A.M., and he had no pulse reported at 11:15 A.M. At 11:20 A.M. he had no respiration and no blood pressure, and various doctors were attempting resuscitative procedures. He was reported expired at 12:15 P.M.

Dr. James Eckenhoff, a qualified anesthesiologist, in response to a hypothetical question, testified that the patient died from a lack of oxygen. He based his opinion on the fact that the patient needed continuous supportive respiration by controlled ventilation at all times and he did not have assisted ventilation until late in the case. The coroner's pathologist testified that his findings were compatible with death due to lack of oxygen.

The trial court granted the motion of Hausman on two grounds: "the general insufficiency of the evidence" and the inadmissibility of the widow's testimony under the Evidence Act. Since we cannot tell what insufficiency the trial court was referring to, we will follow the battle-lines that have been drawn in this court by the parties themselves.

The first question to be resolved is the law applicable to liability, that is, what standard of conduct is to be imposed on a surgeon when the negligent act that directly caused the injury was committed by a person employed by the hospital?

■■ In *Graham v. St. Luke's Hospital,* 46 Ill.App.2d 147, 159, 196 N.E.2d 355, the complaint charged that a nurse negligently injected a hypodermic needle nine days after a successful operation. At the time, the defendant surgeon was not present. In upholding a directed verdict for the surgeon, the court said: "[I]t is clear that a physician is not liable for the negligence of a nurse or intern, who are employees of a hospital *and not under his personal control or supervision."* (Emphasis added.) The following rule is stated in 12 A.L.R.3d 1017, 1021, and the *Graham* case has been cited in support of it:

> "An operating surgeon may be held liable for the negligence of an assisting nurse who is in the general employ of a hospital not owned or controlled by the surgeon where the alleged acts of negligence are done while the nurse is under the direct control or supervision of the surgeon."

This rule has been recognized in 20 other jurisdictions, in one of which the surgeon is compared to the captain of a ship. (*McConnell v. Williams,* 361 Pa. 355, 65 A.2d 243.) The basis for all the decisions upholding liability appears to be that the hospital employee becomes the "borrowed servant" of the surgeon. See *Jackson v. Joyner,* 236 N.C. 259, 72 S.E.2d 589; *Aderhold v. Bishop,* 94 Okla. 203, 221 P. 752; *McConnell v. Williams,* 361 Pa. 355, 65 A.2d 243.

We are not persuaded of the fairness of a rule which would permit the invocation of the doctrine of respondeat superior for every act of negligence by an employee of the hospital simply because the employee came under the temporary supervision or control of the operating surgeon. As a practical matter, the personnel of the hospital and their abilities are often unknown to the surgeon. He may request the assignment of a particular person but usually has little voice in the selection of those who will assist him. The surgeon's own acts, which most directly affect the life and well being of a patient, charge him with his own awesome responsibility. He should not also be saddled with the role of guarantor of the patient's safety from the negligence of others.

■■ Nor do we accept the rationale of those decisions based on the borrowed servant doctrine, which provides that an employee may with his acquiescence or consent be lent by his general employer to a third person for the rendition of a special service, and thereby become the employee of the latter in the performance of such special work. The relationship of employer-employee is not an ephemeral one to be imposed or removed lightly. There are certain rights which accrue to the employee and liabilities which attach to the employer. For these reasons the law requires that before a person may be considered a borrowed servant his services must be loaned with his acquiescence or consent (*M & M Electric Co. v. The Industrial Com.*, Sup.Ct.No. 45494, Agenda 13, January, 1974); and he must become wholly subject to the control and direction of the second employer, and free during the temporary period from the control of the original employer. (*Gundich v. Emerson-Comstock Co.*, 21 Ill.2d 117, 123, 171 N.E.2d 60.) In order to create the relation, therefore, the original employer must resign full control of the employee for the time being, it not being sufficient that the employee is partially under the control of a third person. (I.L.P. Employment § 2, page 368.) It would thus appear under this doctrine that both the doctor and the hospital could not be liable for the same negligent act of the hospital's "employee."

While the right to control the manner in which the work is done is an important factor, it is not a conclusive one. In *Nordland v. Poor Sisters of St. Francis Seraph of Perpetual Devotion*, 4 Ill.App.2d 48, 59, 123 N.E.2d 121, an intern sued a hospital for injuries received while he was assisting surgeons during an operation. Summary judgment was granted for the hospital on the ground that the plaintiff was an employee of the hospital and thus subject to relief only under the Workman's Compensation Act. The plaintiff contended that at the time of his injury he was a loaned employee of the surgeon. The court held, as a matter of law, that he was not:

"In the case before this court it was a part of the hospital's business to furnish the use of the intern, and the fact that during the period of the operation the intern was subject to the direction of a physician does not change the relationship. Here the furnishing of the intern necessarily involved the circumstances that the intern furnished would carry out the directions of the physician in charge, and such duty is recognized by the rules of the hospital governing interns: that he will fulfill orders for treatment given by the attending physician and his own orders must not conflict with those. When he was injured he was acting for the hospital under the directions of the surgeon. It still was the duty of the hospital to see that he carried out the directions devolving upon him as an intern. If the plaintiff did not exhibit the knowledge and skill which a person of his medical education and position should exhibit, or if he did not comply with the directions of the physician, he could have been discharged by the hospital."

■■ A nurse is still subject to the rules and regulations of the hospital, and the doctor may not gainsay them. (*Olander v. Johnson,* 258 Ill.App. 89.) She may be discharged by the hospital but not by the doctor. The hospital, not the doctor, furnishes the equipment that the nurse uses, and she is paid by the hospital. (See *Coontz v. The Industrial Com.,* 19 Ill.2d 574, 577, 169 N.E.2d 94.) We conclude, therefore, that the employees of the hospital assisting a surgeon remain the employees of the hospital even though the surgeon retains some degree of control over them.

■■ We do believe, however, that analogous authority supports the general rule that a doctor may be held liable for the negligence of a hospital employee who is subject to the doctor's control or supervision. The law imposes a duty, for example, on one who entrusts work to an independent contractor, but retains the control of any part of the work, to exercise that control with reasonable care. (Restatement (Second) of Torts § 414.) As the comments to section 414 of the Restatement point out, liability may attach to one who retains less than that degree of control necessary to establish the relationship of master and servant. Similarly, if a surgeon retains supervision or control over other persons participating in an operation, he should be required to exercise that control with reasonable care.

The defendant relies on *Hall v. Grosvenor,* 267 Ill.App. 119, and *Olander v. Johnson,* 258 Ill.App. 89, in support of her contention that there can be no liability in the absence of a master-servant relationship. We do not believe that these two cases are authority for a rule that would preclude recovery against the surgeon in every case where the negligent acts which directly caused the injuries were performed by hos-

pital employees. It is true that both cases made the following statement: *"Generally* an operating surgeon is not legally responsible for the mistake of a nurse not his employee, where an operation is performed at a hospital not owned or controlled by the surgeon." (Emphasis added.) But the statement must be examined in the light of the facts of the cases. Both involved gauze sponges that were left in the patient's abdomen.

In *Olander,* the nurses employed by the hospital kept a record of all sponges, and the method of recording and reporting the sponge count was fixed by hospital rules. At the close of the operation the surgeon examined the field of operation and was unable to see any sponge left in the body. He then asked for the sponge count which was reported as correct. It was conceded that the operating surgeon must devote his entire time to the operation and that it would jeopardize the life of the patient for the surgeon to take the time to keep a count and make a record of the sponges used. The record disclosed that in an abdominal operation the sponges become soaked with blood and secretions and may feel like any other tissue; that occasionally they become rolled up in the abdomen behind the bowels; that the sponges cannot be seen or felt readily; and that it is sometimes almost impossible to distinguish the sponges from the tissues of the abdomen or to locate them. The record also showed that after the surgeon had removed the plaintiff's appendix and operated upon the womb, he made an inspection of the field of operation and did not find any sponge left in her body, and that to have made a further exploration would have been dangerous to the patient.

The *Olander* court noted that it was the right of the hospital to prescribe reasonable rules for the conduct of the institution. Any physician who used the operating room was required by the rules of the hospital to employ the equipment of the hospital. It included the nurses in attendance, the sponges supplied and the records kept. Every physician who availed himself of the privilege of operating in a hospital was required to conform to the rules of the hospital. The court said at page 99:

> "It is indisputable that the operation involved in this case was conducted, so far as the defendant's conduct was concerned, in strict accordance with the established rules and customs of the hospital. It is not denied that he endeavored to see that the rules of the institution concerning the count of sponges were carefully and correctly carried out. That a mistake was made by one of the nurses was no fault of his and appears to have been made in spite of his caution. He inquired about the count and was informed that it was correct. He made an ocular examination without discovering the error. He followed the approved method of examin-

ation unless it is known that a sponge is missing. *Under all the circumstances, we do not see how he could have been expected to do more."* (Emphasis added.)

Would the *Olander* court have held that the surgeon was relieved of liability as a matter of law if he made no examination of the field and made no request for a sponge count? We think not. And would it have so held if the method of sponge counting had been left to the discretion of the surgeon and he decided to dispense with one? Again, we think not. In short, just as a rule making a surgeon liable for every negligent act of every hospital employee under his control is too harsh, a rule exculpating him for every negligent act of persons under his control simply because they are not his employees is too lenient.

The questions then become: Could a fact finder conclude that Dr. Hausman retained control or supervision over Meyer and, if so, did he fail to exercise that control or supervision with reasonable care?

Sylvester Schroeder had been the Administrator of Englewood Hospital. He testified that the individual surgeon was responsible for the surgical procedure when assisted by an anesthetist, rather than an anesthesiologist, who is a physican. The surgeon had the privilege of deciding what anesthetic agent would be used.

Dr. Joonsak Yu, a house physician at Englewood Hospital who was at the time of trial in training as an anesthesiologist, testified that during an operation the surgeon is in charge of the entire procedure in the operating room. He said that it was good anesthesia practice to observe a patient's chest during a surgical procedure and that this can be accomplished by using a screen. After the surgery is completed the surgeon customarily checks into the condition of the patient before he leaves the operating room and remains until the patient is breathing spontaneously.

Dr. Henry Pimentel, who made the original diagnosis of the deceased, testified that the surgeon decides how a patient should be draped, that is, how he should be covered with the sheet, and the anesthetist may not overrule him. He also said that the surgeon is the head man in the operating room and the other people are there to assist him. In shoulder separation cases the patient's face usually can be exposed. In his opinion it was not standard medical practice after an operation to move the patient from the operating room to the recovery room without resuscitative equipment going along with him when he is not breathing. The patient should not be moved from the operating room unless he is breathing spontaneously. He also testified that it is usual and customary for a surgeon to remain in the operating room until he sees that the patient is breathing properly.

Dr. Eckenhoff testified that nurse anesthetists require supervision by

the surgeon just like any nurse. It is the surgeon's prerogative to leave the operating room provided he has a trusted anesthetist in charge and at the same time recognizes that he is responsible. In surgery for a shoulder separation, the usual procedure is that the anesthetist has access to a patient's face. One of the reasons for having access to a patient's face, particularly in a black person, which Foster was, is that there are few places on the body where cyanosis or oxygen lack can be detected. And the most sensitive areas for detecting cyanosis are about the face, such as the mucous membrane beneath the lips or the whites of the eyes. If the surgeon notices change in the color of the blood, it would be good practice for him to inform the anesthetist. He further testified that where the surgeon is directly responsible for the anesthetic, it is his duty to ascertain that the patient is in good health and in good condition upon the completion of the operation, and, in fact, to supervise his care as he is moved to the recovery room. He also testified that the breathing of a patient on continuous drip relaxant, such as anectine, must be assisted or controlled at all times and no patient under any circumstances ever should be transported if he is not breathing without assistance.

Meyer testified that a patient can be breathing at three levels: (1) spontaneous, that is, without any assistance; (2) assisted, that is, breathing shallowly and assisted by the anesthetist's hand on the bag of the machine; and (3) controlled, that is, the patient is being supported totally by artificial means. Foster's blood pressure was decreasing during the operation. She first assisted him when she started the anectine at 10:25 a.m. The patient was breathing shallowly during the course of the operation, and she was assisting him by manipulating the bag by hand on the anesthetic machine. At 11 A.M. the patient was not breathing, and she was assisting him by totally controlling his aspiration. The operation closed at 11:05 A.M. while the patient was not breathing. Dr. Hausman left the operating room at 11:05 A.M. to perform another operation. He did not ask her anything about the patient. He left before the patient was sewn up and while he was breathing with assistance. From 11:05 to 11:10 she continued controlling Foster's respiration and giving him oxygen. She asked the circulating nurse if a Bennett resuscitating machine was available in the recovery room. At 11:10 A.M. Foster's respiration was totally paralyzed. He was lifted physically off the operating table onto a cart. She hyper-ventilated him, that is, she gave him an excess of oxygen which she estimated would last him about 3 minutes. He was then wheeled to a recovery room about 50 to 75 feet from the operating room. When he arrived in the recovery room the Bennett machine was being used by another patient. Meyer also testified that one of the methods of checking a patient's breathing is by watch-

ing the intercostal activity, the movement of the muscles between the ribs. Since she could not observe this activity because of the draping, she felt it by placing her hands on his ribs. When Dr. Hausman ordered more muscle relaxant, she was required to take her hands off his ribs and thereby lost the detection of the intercostal activity. Dr. Hausman never told her that the patient's blood was darker and would not tolerate the use of a bar or screen.

Elenita Diego, a nurse, testified that when Foster arrived in the recovery room his pulse was faint and she could not get a count, nor could she get a count on respiration. His blood pressure was 80/50. He was placed on the Bennett machine 5 minutes later. She also stated that a patient is not to be moved from the operating room who is not breathing spontaneously because there is a possibility the patient would expire in a few seconds. She said her opinion would be the same even if the patient were hyper-ventilated and had a blood pressure of 100/50.

This evidence shows that the surgeon decides how a patient is to be draped, and in this case the patient's face was covered. Hausman would not permit the use of a screen or bar. Thus it can be seen that Hausman's decision to cover the patient's face and chest and to deny the use of a screen affected the ability of Meyer to perform her duty.

■■ The evidence establishes that Meyer should not have moved the patient from the operating room to the recovery room when she did. It also establishes that Dr. Hausman's duty was to remain in the operating room until the patient was breathing without assistance. If he had remained, it would have been his right and duty to prevent Meyer from moving Foster. Under this evidence, we judge that a fact-finder could conclude that Dr. Hausman had direct supervision and control over Meyer and that he failed to exercise it with reasonable care.

The defendant argues that "neither the Illinois Statutes nor case law have imposed on surgeons an absolute duty to remain in the operating room until the suturing has been completed." The allegations of negligence on the part of Dr. Hausman in the complaint were two-fold: (1) a failure to supervise and (2) leaving the operating room before the patient was breathing spontaneously. There is no allegation that he was negligent because he left before the suturing had been completed.

The defendant also argues that the plaintiff was required to prove by expert testimony that "acceptable medical practice always requires the surgeon to remain in the room until the patient is breathing spontaneously." After Dr. Eckenhoff testified that the patient's respiration should have been "assisted or controlled from the very beginning," the following occurred:

"Plaintiff's Attorney: Q. Now, with reference to moving the

patient the question stated that hyper-ventilation had occurred prior to moving, and that the moving of the patient took less than a minute. Would that ordinarily be a period of time you would expect the hyper-ventilation to serve the needs of the patient?

Dr. Eckenhoff: A. From a theoretical point of view, a minute following a period of hyper-ventilation, depending upon how the hyper-ventilation was, would be permissible, except, as I say, *one never transports a patient that is not breathing without assisting his ventilation.*

Q. In your opinion, the hyper-ventilation could not serve through that period of time without assistance?

A. No, sir.

Q. During the period of time—from the time the actual closure of the surgical wound has occurred until the patient is removed from the operating room, what would be the usual and customary role of the operating surgeon?

Defense Attorney: Object to this because he doesn't have the facts of the operating surgeon that was there.

The Court: Excuse me. Your objection is overruled. You may answer.

Dr. Eckenhoff: A. In this instance where the surgeon is directly responsible for the anesthetic, it is *his duty* to ascertain that the patient is in good health and in good condition upon the completion of the operation, and, in fact, *to supervise his care as he is moved to the recovery room.*" (Emphasis added.)

In our view, when one medical expert testified that it is the duty of another doctor to do certain acts, that was equivalent to saying that acceptable medical practice requires it. We also note that Dr. Pimentel testified that it was not standard medical practice to move a patient who is not breathing without resuscitative equipment going with him. He later said that a patient should not be moved unless he is breathing spontaneously.

The trial court granted judgment notwithstanding the verdict for the further reason that Dorothy Foster had failed to prove by competent evidence that the deceased had any "surviving spouse [or] next of kin." (Ill. Rev. Stat. 1971, ch. 70, sec. 2.) Before this question may be resolved, it is necessary to recite the pleadings, the pertinent evidence and the rulings and remarks of the court.

The original and second amended complaints alleged that the deceased left surviving his wife and three children. Hausman's answers to the original and second amended complaints neither admitted nor denied

this allegation but demanded proof. The trial began on October 20, 1971; and on October 27, the plaintiff filed a third amended complaint, again alleging that the decedent left a wife and three minor children surviving. After the verdict the defendant answered, denying that allegation. On November 29, the post-trial motions of all defendants were heard. Before the arguments began, the attorneys for the plaintiff asked that there be added or incorporated into the complaint a copy of an order of the Probate Court declaring Dorothy Foster the widow, and three children the heirs and next of kin of the deceased, and a letter of administration dated October 3, 1969, stating that Dorothy Foster had been appointed administrator of Vercey Lee Foster's estate. No date nor signature of a judge appears on the order declaring heirship, but one of the attorneys for the plaintiff told the court that both matters had been entered "long prior to the trial of this case." Over the objection of Hausman's attorney, the plaintiff's motion was allowed.

When Dorothy Foster was called as a witness, the following occurred:

"Mr. Demos: Mrs. Foster, would you take the stand, please?
(Witness sworn.)

Mr. Harrold: If the court please, on behalf of the estate of Dr. Charles Hausman, under the law, under the Evidence Act, and under the Dead Man's Act, we move that the witness be barred from any testimony with regard to Dr. Charles Hausman and the estate of Dr. Charles Hausman.

The Court: Ladies and gentlemen of the jury, you are instructed that you are not to consider the testimony of this witness against the estate of Dr. Hausman; that is, Mr. Harrold's client. You may consider the testimony with regard to the other defendants in this proceeding. You may proceed."

No evidence of heirship, other than Mrs. Foster's testimony, was introduced before the jury. At the close of the plaintiff's case, the attorney for Hausman moved for a directed verdict on the ground that there was no proof that there was a widow or that there were any children. After hearing arguments from both sides concerning the applicability of the Evidence Act, the court said:

"All of the commentators seem to agree that the Dead Man's Act is an anachronism and shouldn't be allowed into our law. And I can see why they agree on it, because you can reach a ridiculous result that she couldn't testify on the date of birth—of death or the date of their marriage, or anything else. I don't think it applies here. Your motion will be denied."

In ruling on the post-trial motions, the court said:

"With regard to the defendant Hausman's motion, the motion

for judgment notwithstanding the verdict, the defendant Hausman raises two points, and the point concerning evidence on section 2 of the Evidence Act, and a general insufficiency of the evidence with regard to the estate of Charles Hausman, the court finds that each of these arguments it believes to be valid, and the motion for judgment notwithstanding the verdict will be allowed."

From the trial court's final ruling we conclude that: it determined that the records of the Probate Court offered at the post-trial motion were either submitted too late, were not sufficiently authenticated, or were not binding on the defendant Hausman because she was not a party to the Probate Court proceeding; and it reversed its previous ruling on the applicability of the Evidence Act at the close of the plaintiff's case and adhered to its original ruling that the Act did bar Dorothy Foster's testimony against the estate of Dr. Hausman.

■■ We agree that the purported records of the Probate Court could not provide the requisite proof of heirship since they came after the proofs were closed and after judgment. Amendments to pleadings after judgment are permitted only to conform to the proof offered at trial, and new proof may not be submitted under the guise of an amendment to the pleadings. Further, the unsigned, undated, uncertified "order" of heirship is a mere piece of paper that is entitled to no weight.

Section 2 of the Evidence Act, in effect before October 1, 1973, provided in part that no interested party to any civil action "shall be allowed to testify" when any adverse party sues or defends as the administrator of any deceased person. The Act contained a number of exceptions to this general prohibition:

1. If the interested party is called as a witness by the adverse party suing or defending as an administrator.
2. The interested party may testify to facts occurring after the death of the deceased.
3. If an agent of the deceased testifies on behalf of the administrator to any conversations or transactions between the agent and the opposite party or party in interest.
4. If the party suing or defending or any party having an interest in the action testifies on behalf of the administrator to any conversation or transaction with the opposite party or party in interest.
5. If any witness testifies on behalf of any party to any conversation or admission by any adverse party or party in interest occurring before the death and in the absence of the deceased.
6. If the deposition of the deceased person is read at the trial.

Of the six exceptions, five occur when the deceased's representative "opens the door." The other permits any evidence of all facts occurring after the death of the deceased.

■■ The primary purpose of construing statutes is to determine the intent of the legislature. Why was evidence of facts occurring after the death of the deceased excepted? The only rational explanation seems to be that the legislature intended to bar only that evidence which the deceased himslf could have refuted. The defendant argues that whether Dr. Hausman could refute the testimony offered is immaterial to the operation of the statutory bar citing *Engstrom v. Edgar*, 126 Ill.App.2d 369, 261 N.E.2d 788. In that case the plaintiff was injured in a funeral home owned by the deceased. The case is silent on the facts of the accident since no evidence was heard. The plaintiff contended that the deceased could not have offered relevant testimony on the question of negligence and, therefore, there was no need to invoke the statute. Significantly, the *Engstrom* court pointed out that what the deceased might actually have testified to was pure speculation.

More directly in point is the case of *Martin v. Miles*, 41 Ill.App.2d 208, 190 N.E.2d 473, where the plaintiff's administrator made a motion out of the presence of the jury to prohibit the defendant from being called as a witness. He argued that otherwise he would be required to object in the presence of the jury who might conclude that he was withholding evidence. The appellate court upheld the denial of the motion stating at page 210:

> "It is obvious that defendant could have been competent to testify *concerning matters not directly relating to the accident or the injury*, and as to conditions after the death of plaintiff's intestate." (Emphasis added.)

There is, in addition, persuasive authority from other jurisdictions which support the plaintiff's position. In *Elsea v. Smith*, 273 Mo. 396, 408, 202 S.W. 1071, 1073, the Supreme Court of Missouri said:

> "It is a well-worn maxim that 'the reason of the law is the life of the law.' The purpose of this statute, it is true, is to silence the voice of one of the parties to a litigated proceeding, where death has hushed into eternal stillness that of the other; but it must be construed in a reasonable manner and one compatible with the purpose of its enactment. [Citation.] This statute was not intended to render incompetent as a witness for all purposes the surviving party to the proceeding, but only to the extent that his testimony might be subject to question by the other party if living. In other words, the disqualification is not general, but is limited to transactions between the witness and the party then dead. [Citations.] Ruled otherwise, the reason for the statute ceases to exist."

In *Fellows v. Farmer* (Mo.App.), 379 S.W.2d 842, a widow sued the defendant administrator for the wrongful death of her husband. She was

permitted to testify over objection that on the date of the accident her husband was a soldier, 32 years of age, stationed at Fort Leonard Wood, and earning $188 per month. The Appellate Court of Missouri, citing *Elsea v. Smith*, upheld the ruling of the trial court.

While we have found no other statute with the precisely same language as the Illinois Act, our research has disclosed, without exception, the same interpretation of the Dead Man's Act: The interested party is barred from testifying only as to matters which the deceased could have refuted. See *Sansom v. Sturkie*, 245 Ala. 514, 18 So.2d 267; *Krause v. Emmons*, 29 Del. 104, 97 A. 238; *Snow v. Snow*, 71 Ga.App. 316, 30 S.E.2d 823; *In re Mueller's Estate*, 166 Neb. 376, 89 N.W.2d 137; *Tallman v. First National Bank of Nevada* 66 Nev. 208, 208 P.2d 302; *Hollister v. Fiedler*, 17 N.J. 239, 111 A.2d 57; *In re Enggren*, 174 Misc. 194, 20 N.Y.S.2d 384; *Wilson v. Ervin*, 227 N.C. 396, 42 S.E.2d 468; *Rothman v. Gillett* (Texas Civil Appeals), 315 S.W.2d 956.

The record shows that Dorothy Foster's deposition had been taken and her marital status questioned before trial. She was married in a church in Memphis, Tennessee, in August, 1964. She and the deceased got a marriage license in Chicago in January, 1965. Their first child was born in June, 1965, and two others later. All the children were born in Chicago. Assuming the argument of the defendant to be correct, how would Dorothy Foster prove that she was married to the deceased? It would require more than a marriage certificate because the same names would not be sufficient. Someone would still be required to prove that the parties named in the marriage certificate were in fact the deceased and Dorothy Foster, the administrator. The only possible way of proving the marriage would be the testimony of someone, other than Dorothy, who was present at the ceremony. How could the three children, 6, 4, and 3, establish their ages and their heirship without the testimony of their mother? Birth certificates would not be sufficient, not only because they are sometimes incomplete and inaccurate but, at best, would contain only names of the parents that were the same as the names of the decedent and the administrator. But, most important, how would Dr. Hausman himself have refuted her testimony?

In *Smith v. Billings*, 177 Ill. 446, 452, 53 N.E. 81, the court interpreted the Illinois statute as follows:

> "The theory of the general statute, innovating, as it did, so thoroughly upon the rule of the common law, was, that the light should not be excluded because it might come from a possibly interested source, and hence that those persons, the parties who were presumed to know more about the transaction in dispute, should each be allowed to give their own version of the transac-

tion, leaving the jury to judge of their credibility. But in perfect harmony with this general theory, and in the utmost accord with the reason of the law, it was deemed wise to provide that if one could not, by reason of death, give his version neither shall the other. The want of opportunity to assist in the preparation of the cause by the decedent is not the sole ground for excluding the testimony of the survivor, nor by any means the principal ground. The prime reason is found in the inability of the party to oppose his statements,—his testimony,—to that of the surviving adversary, and this has been more than once announced as the reason of the law. [Citations.]"

See also *VanMeter v. Goldfarb*, 317 Ill. 620, 148 N.E. 391; *Combs v. Younge*, 281 Ill.App. 339; *Rouse v. Tomasek*, 279 Ill.App. 557.

■■ It has been said repeatedly that the purpose of the Dead Man's Act was to prevent fraudulent claims against an estate and to put the parties on equal footing. The estate of Dr. Hausman had the precisely same evidentiary capability that Dr. Hausman himself would have had to refute the contentions of Dorothy Foster. The invocation of the statute in this case would do nothing but defeat the valid claims of the widow and three small children. "[T]he courts have always endeavored to construe the statute according to its spirit and not merely according to its letter." *Butz v. Schwartz*, 32 Ill.App. 156, 159, *affirmed*, 135 Ill. 180, 25 N.E. 1007.

We note parenthetically that the present section 2, which became effective October 1, 1973, and expressly applies only to proceedings filed after that date, provides: "No person shall be barred from testifying as to any fact relating to the heirship of any decedent." Our decision, of course, does not rely on the present statute.

■■ We judge, therefore, based on precedent and what we deem to be the construction of the statute according to its spirit, that the court correctly interpreted the act on the motion for a directed verdict and erred when it reversed itself and granted judgment notwithstanding the verdict.

No question is raised of the sufficiency of the evidence to support the verdict against the hospital and Grace Meyer. They seek a new trial contending only that the trial court erred in not striking from the evidence a life expectancy table.

After the plaintiff had testified, her attorney offered the life expectancy table, Plaintiff's Exhibit No. 19. The court asked whether there was any objection, and after the attorney for the hospital and Meyer said: "No, Your Honor," the table was read to the jury. It recited the life expectancies of the deceased, his widow and his three children. The plaintiff

then rested, and after colloquy between the court and counsel the jury was excused until the following morning. The attorney for the hospital and Meyer then made a motion to strike the exhibit and the evidence read from it on the ground that no evidence had been introduced "to reduce down to present day cash value any pecuniary loss which [might] be used in conjunction with the life expectancy table." The motion was denied. At the conference on instructions, no objection was made to Plaintiff's Instruction No. 11 (Illinois Pattern Instructions—Civil 34.05), which provides that, in calculating the amount of pecuniary benefits the survivors would have received from the deceased, the jury was not simply to multiply the life expectancies by the annual benefits but, rather, to determine the present cash value of the benefits. Both sides asserted before the jury their respective theories of how the evidence should be construed under the guidelines of the instruction to determine "present cash value."

Because of this instruction, the defendants argue that no evidence of life expectancy should have been admitted without an actuarial table or testimony of an actuary or economist. No Illinois case has been cited in support of the defendants' contention. The Committee Comments are silent with respect to any foundation proof necessary to support the admission of the mortality table or the instructions which refer to it. See also Illinois Pattern Instructions—Civil 34.04.

The defendants have cited three cases from the 3d Federal Circuit in support of their position: *Ballantine v. Central R.R.*, 460 F.2d 540; *Haddigan v. Harkins*, 441 F.2d 844; and *Russell v. City of Wildwood*, 428 F.2d 1176. In each of those cases mortality tables were introduced into evidence, apparently without objection. What was objected to, unlike this case, was the instruction of the court concerning the jury's duty to reduce future lost earnings to present worth. The circuit court held that the instruction should not have been given because the plaintiff had not submitted "any actuarial evidence or guidance from which the jury could have made the calculation of present worth required by the damage charge." (*Haddigan v. Harkins*, 441 F.2d 844, 853.) Thus, the jury was permitted to receive certain evidence without objection but was to be given no guidance by the court as to what they were supposed to do with such evidence. We are not persuaded of the soundness of a holding that produces such a result.

■■ We need not pass on the question, however, because in our view the defendant has waived the point by failing to make timely objection in the trial court. It is the general rule that an objection to the admission of evidence must be made in apt time, that is, at the time of its admission. (*People v. Trefonas*, 9 Ill.2d 92, 98, 136 N.E.2d 817.)

If the defendants' position is correct, the defect in the evidence—the absence of a proper foundation—was present at the time the exhibit was offered. If the trial court had struck the evidence after the plaintiff had rested, the plaintiff would then be placed in the position of moving for leave to reopen her proof to supply the necessary foundation, a motion which might or might not be granted in the court's discretion. We judge that by waiting until the exhibit was received and read to the jury and the plaintiff and rested, the defendants did not object within apt time.

For the foregoing reasons the judgment notwithstanding the verdict in favor of Dr. Hausman's estate is reversed; and the judgment in favor of the plaintiff and against the defendants, Meyer and Englewood Hospital Association is affirmed.

Judgments reversed in part and affirmed in part.

BURKE and HALLETT, JJ., concur.