FLORENCE L. MOSLEY *et al.*, Plaintiffs, *v.* NORTHWESTERN STEEL AND WIRE COMPANY, Defendant and Third-Party Plaintiff-Appellant.—(GEORGE REITZEL, a/k/a Reitzel Electrical Contractors, Third-Party Defendant-Appellee.)

First District (2nd Division)    No. 78-341

Opinion filed September 4, 1979.—Rehearing denied October 4, 1979.

Garretson & Santora, and Jerome H. Torshen, Ltd., both of Chicago (Jerome H. Torshen and Abigail K. Spreyer, of counsel), for appellant.

James G. Head, of James G. Head & Associates, Ltd., of Chicago (Sidney Z. Karasik, of counsel), for appellee.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Plaintiffs, Florence Mosley on behalf of herself and her minor son, brought an action under the Structural Work Act to recover for fatal injuries to William Mosley (hereinafter Mosley) after he fell from a catwalk at a construction site at a steel mill owned by defendant, Northwestern Steel and Wire Company (hereinafter Northwestern).

Northwestern filed a third-party complaint for indemnification against Mosley's employer, subcontractor George Reitzel, a/k/a Reitzel Electrical Contractor (hereinafter Reitzel). A jury rendered a verdict in favor of plaintiffs on the principal action and in favor of Reitzel on an implied indemnity count of the third-party action. The court found in favor of Reitzel on a contractual indemnity count and entered a judgment against Northwestern on both the principal and the third-party actions. Northwestern's post-trial motions were denied, and Northwestern appeals, presenting the following issues for review: (1) whether the crane operator, whose actions allegedly caused the fatal accident, was an employee of Reitzel or was a loaned employee of Northwestern at the time of the accident; (2) whether Northwestern is entitled to indemnification from Reitzel; and (3) whether the trial court erred in refusing to vacate the judgment in the principal action and to dismiss the principal action pursuant to a stipulation between Northwestern and plaintiffs.

We affirm.

In 1973 Northwestern was constructing an addition to its steel mill in Sterling, Illinois, and pursuant thereto, in September 1973 Northwestern entered into a contract with Reitzel for the performance by Reitzel of electrical work. The purchase order provided that Reitzel would:

> "Furnish and pay for all supervision, labor, equipment, small tools, supplies, services, utilities (except power) and facilities that are necessary and proper to perform all electrical work in connection with our 14″ mill in accordance with all conditions of this order and as directed by our Engineering Department."

The purchase order also contained the following indemnity provision:

> "SAFETY—Seller agrees to comply with the provisions of the Occupational Safety and Health Act of 1970 and the standards and regulations issued thereunder and certifies that all items furnished under this Order will conform to and comply with said standards and regulations. Seller further agrees to indemnify and hold harmless Purchaser for all damages assessed against Purchaser as a result of Seller's failure to comply with the Act and the standards issued thereunder and for the failure of the items furnished under this Order to so comply."

Northwestern also contracted with other trades including Holman Steel Erectors, pipefitters and concreters, and Northwestern coordinated all of the workers.

Reitzel began working pursuant to its contract and was involved in assembling parts to two overhead cranes, an AC crane and a DC crane. The AC crane had a catwalk which ran the length of the building and which was used by the workers of all trades to traverse the building and

to do certain work that needed to be done "up in the air." The AC crane was completed in March 1974, and Lawrence Weinreich, an employee of Reitzel, became the operator of the crane. The crane was operated from a cab that is suspended underneath the crane. To gain access to the cab the operator would climb a ladder at one end of the building up to the catwalk, walk along the catwalk to a hatch door, go through the hatch door and then climb down a ladder to the cab.

On September 18, 1974, at approximately 2 p.m., Weinreich was told by a Reitzel foreman to bring the crane to a certain position and wait for a ladder to be transferred from the ground to two persons on the catwalk. George Boyden and William Mosley, both employees of Reitzel, were on the catwalk. When Weinreich observed Boyden and Mosley having a difficult time getting the ladder over the guard rail on the catwalk he climbed up the ladder from the cab of the crane, went through the hatch door, left the hatch door open and walked on the catwalk in a northerly direction to help the two men get the ladder on to the catwalk. The ladder was made of iron, was 10 feet long and weighed 100 pounds. After the ladder was on the catwalk, the three men put the ladder on their shoulders and started walking south on the catwalk toward the hatch door. Their intention was to bring the ladder on the south side of the building and install a section of the DC rail. Boyden was first, then Weinreich and Mosley. When Boyden reached the hatch door, he stepped over it, as did Weinreich. Mosley fell through the door to the ground and received fatal injuries.

On November 21, 1974, plaintiffs (Mosley's widow and minor son) filed an action under the Structural Work Act against Northwestern to recover for the injuries sustained by Mosley.[1] On February 19, 1975, Northwestern filed a third-party complaint against Reitzel.[2] Count I of the third-party complaint was based on the theory of implied indemnity, and it alleged that Reitzel violated the Structural Work Act through its employees, that the injuries to Mosley were proximately caused by the wilful acts or omissions of Reitzel and its employees, and that Northwestern was not actively negligent. Count II was based on the indemnity provision in the written purchase order.

The principal action and Northwestern's third-party complaint were

---

[1] Holman Erection Company, which installed the crane and catwalk in its upright position, was also named as a defendant, but Holman was dismissed as party pursuant to a motion by plaintiff during trial.

[2] Holman Erection Company was also named as a third-party defendant; however, Northwestern dismissed count II of the complaint, and a directed verdict was granted in favor of Holman with regard to count I. Reitzel also filed a third-party complaint against Crane System, Inc., the designer and manufacturer of the crane, a counterclaim against Northwestern and a crossclaim against Holman. The counterclaim and cross-claim were dismissed prior to trial on motions by Northwestern and Holman, respectively. The third-party complaint against Crane System, Inc., was dismissed pursuant to a motion by Reitzel.

tried together in a jury trial, although it was agreed among the parties that the issue regarding the contractual claim for indemnity would not be submitted to the jury. The following evidence, pertinent to this appeal, was adduced at trial:

Lawrence J. Weinreich testified that he was employed as a journeyman wireman electrician by Reitzel in November 1973. Weinreich had been hired by Reitzel through the union hall; he worked exclusively on the Northwestern job and was laid off when the work was completed in the summer of 1975. Weinreich began working at the Northwestern site in February 1975, at which time he was involved in assembling parts to the DC overhead crane. In March 1974 he became the sole operator of the AC crane. Weinreich operated the crane for all the trades involved in the construction and he would receive directions from the foremen of all the trades and from Northwestern personnel. Weinreich saw Northwestern personnel on a daily basis, and Northwestern employee, Milt Ward, worked directly with Weinreich's foreman, Robert McCoy. Also, Northwestern had a man on the job at all times to supervise the electrical work. Milt Ward and Robert McCoy held meetings on a weekly basis to discuss safety. At the time of the accident, Weinreich was being paid by Reitzel, and his instructions on that particular day came from Reitzel. A Reitzel foreman told Weinreich where to position the crane just before the accident, but he was not specifically directed by anyone to assist Boyden and Mosley with the ladder. After the accident, bars were installed around the ladder leading from the catwalk to the cab of the crane so that one going through the hatch door to the cab would be fully enclosed.

George Boyden testified that he was employed by Reitzel as a journeyman electrical lineman and he worked at the Northwestern steel mill project. All the trades involved in the construction used the catwalk as a scaffold and used the AC crane. There were many days when Reitzel could not use the crane because it was being used by other trades. Boyden took orders only from Reitzel foremen.

George Reitzel testified that the purchase order from Northwestern stated that Reitzel was to comply with the Occupational and Safety Health Act (hereinafter OSHA) but that the only way he could comply was through his employees.

Robert McCoy testified that in September 1974 he was employed as general foreman for Reitzel at the Northwestern steel mill. McCoy was in charge of the electricians, and he reported to Milt Ward and Charlie Bosco, both of whom were employed by Northwestern. McCoy testified that this project was different from others he had worked on because no general contractor was designated, rather Northwestern acted as the general contractor. Further, on other jobs McCoy would receive a set of

plans and specifications that he would work by and he would tell Reitzel's crew what to do and when to do it. However, on this job Northwestern controlled the whole job, and Northwestern personnel would tell McCoy what was to be done and when, and McCoy would relate such to his crew. There was constant control by Northwestern, and Northwestern had three or four electrical engineers and inspectors that supervised continuously. Northwestern had superintendents in each phase of the construction that directed the various trades and exerted control. Kurland, Northwestern's overall superintendent of construction, and Mr. Dillion, chairman of the board of Northwestern, also took active parts in the construction. Dillion had fired persons working for various contractors on at least 10 occasions. Northwestern also controlled the number of men on the job. If Northwestern wanted more electricians, they would tell Reitzel, and Reitzel would call the union hall. Neither Reitzel nor McCoy had authority to hire additional men without approval from either Ward or Bosco. Both McCoy and Northwestern maintained records of the workers' time. McCoy testified that the Northwestern job differed from other jobs in that Northwestern purchased all necessary material, including that which would normally be supplied by the contractor. Reitzel only supplied labor.

McCoy testified further that Weinreich was an electrician but that as soon as the AC crane was installed, Weinreich became the operator of the crane and was not working as an electrician. Weinreich was classified as a crane operator. Weinreich was paid by Reitzel, but he worked independently of the electrical crew and McCoy had no control over him. If Northwestern told Weinreich to do something, McCoy had no authority to countermand the order. Also, on numerous occasions Weinreich would work late or work on Saturdays when no electricians or electrical supervisors were working. On the day of the accident the particular work being done was electrical work; however, the electrical engineer for Northwestern authorized the work on the DC crane on the day in question. Northwestern knew that the crane had to be placed in a parked position and that the ladder had to be lifted up to the catwalk and carried across the catwalk to the DC crane. McCoy testified that he and the Northwestern foremen held meetings to discuss safety and that all workers were provided with pamphlets regarding safety measures. McCoy did not know whether Weinreich was instructed to close the hatch door whenever he came up to the catwalk; but McCoy recalled seeing the hatch door open on other occasions and he had told several workers to keep the hatch door closed. It is a violation of OSHA to leave the hatch door open when there are persons on the catwalk. There is also a regulation that open hatchways be guarded by rails, but no guard rails were furnished by either Northwestern or Reitzel. Northwestern did not

furnish a scaffold, so the workers of all the trades used the catwalk as a scaffold, and Northwestern had knowledge that the catwalk was being used as a scaffold.

Based on the foregoing the jury rendered a verdict in favor of plaintiffs and against Northwestern and assessed damages in the amount of $228,000. On the implied indemnity count of the third-party complaint the jury found in favor of Reitzel and against Northwestern. In response to two special interrogatories, the jury found that there was no misconduct on the part of Reitzel of a quality greater in degree and character than that of Northwestern and that at the time of the accident Weinreich was the agent of Northwestern. The trial court found that Northwestern was not entitled to indemnity from Reitzel under the indemnity provision in the purchase order agreement. The court then entered judgments on the verdicts and on its own finding. Northwestern filed a motion for judgment notwithstanding the verdict and for a new trial and also filed a motion to vacate the judgment in favor of plaintiffs pursuant to a stipulation between plaintiffs and Northwestern. The trial court denied the post-trial motions.

Northwestern initially contends that under the express indemnity provisions in the purchase order, Reitzel had a duty to indemnify Northwestern for violations of OSHA. Thus, Northwestern contends that the trial court erred in failing to enforce the indemnity agreement. Reitzel contends that the indemnity provision applies only to violations of OSHA committed by Reitzel, that Weinreich was a loaned servant of Northwestern, and that Weinreich's acts are attributable to Northwestern. Thus, Reitzel contends that the indemnity provision is not applicable and Reitzel had no duty to indemnify Northwestern for Northwestern's own violation of OSHA.

■■ ■ It is well established that an indemnity contract or contract provision is to be construed as any other contract and that its meaning must be determined from the language used unless the language is ambiguous. (*National Bank v. West Construction Co.* (1976), 41 Ill. App. 3d 686, 689, 355 N.E.2d 43.) Generally, the language in a contract agreeing to indemnify is specifically limited to acts or omissions of the contractor or his agents. (*Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93; *Zadak v. Cannon* (1974), 59 Ill. 2d 118, 319 N.E.2d 469.) Courts have held that an indemnity contract will not be construed as indemnifying one against his own negligence unless such a construction is required by clear and explicit language of the contract or such intention is expressed in unequivocal terms. (*Davis*, at 396-97.) Further, the legislature enacted a statute effective September 1971 which voids as against public policy contract clauses that purport to indemnify a person against his own negligence. Ill. Rev. Stat. 1975, ch. 29, par. 61.

■■■ In the agreement between the parties in the case at bar, Reitzel agreed to:

> "* * * indemnify, protect, defend and save harmless [Northwestern], its agents, officers, and employees against any and all claims, demands, judgments or causes of action by any party or parties * * * whatsoever for loss, injury (including death) or damage of any kind or character either to persons or property directly or indirectly arising out of performance by Reitzel hereunder * * * except for those arising solely from acts or omissions of [Northwestern]."

Reitzel further agreed to:

> "* * * indemnify and hold harmless [Northwestern] for all damages assessed against [Northwestern] *as a result of [Reitzel's] failure to comply with [OSHA]* and the standards issued thereunder and for the failure of the items furnished under this Order to so comply." (Emphasis added.)

The language clearly states that Reitzel had a duty to indemnify Northwestern if damages resulted from Reitzel's failure to comply with OSHA. Reitzel would have a duty to indemnify Northwestern only if an employee or agent of Reitzel committed a violation of OSHA that resulted in damage. It is well established that under the doctrine of respondeat superior the negligence of an employee is imputable to his employer if the relationship of principal and agent existed at the time of and in respect to the particular transaction out of which the injury arose. (*Winston v. Sears, Roebuck & Co.* (1967), 88 Ill. App. 2d 358, 363-64, 233 N.E.2d 95, *appeal denied* (1968), 38 Ill. 2d 628.) However, if the employee was not acting as the employer's agent at the time of the injury, the employer cannot be held liable for the employee's acts. (*Kuberski v. Noonan* (1974), 23 Ill. App. 3d 237, 239, 318 N.E.2d 677.) Thus, in the case at bar the indemnity provision would be applicable only if Weinreich was an employee or agent of Reitzel at the time of the occurrence. If Weinreich was the "loaned employee" of Northwestern at the time of the occurrence, Reitzel would not be responsible for Weinreich's acts and would have no duty to indemnify Northwestern under the express language of the purchase order agreement.

■■ The loaned-employee doctrine provides that an employee in the general employment of one person may, with his consent, be transferred or loaned to another for some particular work in such a way as to become the servant of the other in doing that work. (*M & M Electric Co. v. Industrial Com.* (1974), 57 Ill. 2d 113, 311 N.E.2d 161; *Fransen Construction Co. v. Industrial Com.* (1943), 384 Ill. 616, 52 N.E.2d 241; *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 45 N.E.2d 665.) In such a case the second employer is primarily liable for the employee's acts, and

the first employer is only secondarily liable. (*Freeman v. Augustine's Inc.* (1977), 46 Ill. App. 3d 230, 360 N.E.2d 1245; see also *Chicago's Finest Workers Co. v. Industrial Com.* (1975), 61 Ill. 2d 340, 335 N.E.2d 434.) The test is whether or not the employee becomes wholly subject to the control and direction of the second employer and free from the control of the original employer. (*Merlo*, at 320; *Freeman*, at 233; *Foster v. Englewood Hospital Association* (1974), 19 Ill. App. 3d 1055, 1060, 313 N.E.2d 255, *appeal denied* (1974), 56 Ill. 2d 586.) This test requires consideration of various factors such as the manner of hiring, the mode of payment, the nature of the work, the manner of direction and supervision of the work, and the right to discharge. (*Merlo; Fransen; Freeman.*) In identifying the employer of an alleged loaned employee, the dominant factor is the right to control the manner in which the work is to be done, and the most significant inquiry is the extent to which the first employer delegated or released to the second employer the right to control. (*Raymond Concrete Pile Co. v. Industrial Com.* (1967), 37 Ill. 2d 512, 516-17, 229 N.E.2d 673.) Further, it has been held that a person cannot become an employee of the second employer unless the second employer has the power to discharge or fire the employee. (*Richard v. Illinois Bell Telephone Co.* (1978), 66 Ill. App. 3d 825, 832, 383 N.E.2d 1242.) Whether a loaned-employee relationship exists is a question of fact for the jury, particularly where conflicting inferences may be drawn from the evidence. (*Saldana v. Wirtz Cartage Co.* (1978), 74 Ill. 2d 379, 389-90, 385 N.E.2d 664; *M & M Electric*, at 117; *Gundich v. Emerson-Comstock Co.* (1960), 21 Ill. 2d 117, 171 N.E.2d 60; *Becke v. Fred A. Smith Lumber Co.* (1973), 9 Ill. App. 3d 563, 292 N.E.2d 572.) A reviewing court will reverse only when the decision is against the manifest weight of the evidence. *M & M Electric; Becke.*

In the case at bar the jury through a special interrogatory found that Weinreich was the loaned employee of Northwestern. The trial court refused to set aside the jury's determination and denied Northwestern's motions for judgment notwithstanding the verdict and for new trial. It is well established that a judgment notwithstanding the verdict should be entered "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) It is further established that a motion for new trial should be granted if the verdict is contrary to the manifest weight of the evidence. (*Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32.) The decision of the trial court on a motion for new trial will not be reversed on appeal unless it affirmatively appears from the record that the trial court abused its discretion. *Ferenbach v. DeSyllas* (1977), 45 Ill. App.

3d 599, 603, 359 N.E.2d 1214; *Spankroy v. Alesky* (1977), 45 Ill. App. 3d 432, 436, 359 N.E.2d 1078.

The evidence in the case at bar showed that Weinreich was hired by Reitzel to work as an electrician on the Northwestern job and that Weinreich was paid by Reitzel. However, the evidence also showed that a short time after Weinreich began working, his duties shifted to that of crane operator and he no longer worked exclusively for Reitzel. Weinreich operated the crane for all the trades, including Reitzel, and he was directed by foremen for Northwestern, in addition to taking directions from foremen from all the various trades. The evidence, which was not contradicted, established that Reitzel did not have control over Weinreich; there were occasions when Reitzel wanted Weinreich to use the crane for electrical work but was told by Northwestern that some other trade needed Weinreich. Thus, it appears that Northwestern would decide what work Weinreich was to do on a particular day, and then Weinreich would take directions from the foreman of the particular trade using the crane that day. In fact, there was testimony that Northwestern ordered the work to be done on the DC crane on the day of the occurrence.

■■ It has been held that in determining the existence of a loaned employee, a distinction is to be made between the giving of directions and the actual control over the manner of doing the work. (*Gundich*; *Becke*; *Richards*.) The giving of hand signals, for example, as to where to place a machine or position a crane, is not the giving of orders which evidences control and the existence of a loaned employee. (*Gundich*.) In the case at bar, the evidence shows that Northwestern exercised control over Weinreich, and Reitzel assumed the role of giving hand signals or directions to Weinreich.

■■ Several other facts indicate that Weinreich was the loaned employee of Northwestern. First, Weinreich's duties changed to that of crane operator after being hired by Reitzel. A change in the nature of one's work from the usual work done for the first employer to some special or different work done for the second employer indicates a loaned-employee relationship. (*Freeman v. Augustine's Inc.*) In *Freeman* plaintiff was hired as a maid by Augustine's Motor Lodge and shortly thereafter her job was reclassified and her sole duty was to work in the laundry room located in defendant's restaurant. Plaintiff continued to be paid by the original employer, and her work benefitted the original employer; however, she followed the directions of defendant. The court found that plaintiff was assigned to perform special services for defendant and thus it held that plaintiff was the employee of defendant. Similarly in the case at bar, Weinreich was assigned the special duty of operating the crane

and he took orders from Northwestern. Secondly, Weinreich impliedly consented to being a loaned employee by working on days when Reitzel did not work and by working for the other various trades. The employee must at least have impliedly acquiesced in the new relationship before he can acquire the status of a loaned employee. (*M & M Electric*, at 119; *Freeman*, at 234.) Thirdly, there was evidence that Northwestern had the power to discharge any worker and could have discharged Weinreich. In fact, many of the cases cited by Northwestern are distinguishable from the case at bar on the basis that in the cited cases the alleged borrowing employer did not have a right to discharge the alleged loaned employee.

Northwestern cites several cases in which the courts held that an employee of a subcontractor was not a loaned employee of the general contractor. However, each case must be determined on its own facts. (*Merlo*.) For example, in *M & M Electric* the court found no loaned-employee relationship where the employee was hired by the subcontractor, took orders only from the subcontractor and never consented explicitly or implicitly to becoming an employee of the general contractor. Further, in *M & M Electric* the general contractor had no power to discharge the employee and supervised the work in only a general way. In *Yankey v. Oscar Bohlin & Son* (1962), 37 Ill. App. 2d 457, 186 N.E.2d 57, the subcontractor agreed to provide a machine and an operator to do hoisting work; the operator was hired and paid by the subcontractor and only the subcontractor had the right to discharge him. The subcontractor controlled the operation of the machine and the general contractor only gave hand signals to the operator. The court held that no loaned-employee relationship existed based in part on the fact that while performing the operations, the operator-employee was acting within the scope of his employment with the subcontractor and was not performing any special services for the general contractor.

■■ In contrast to *M & M Electric* and *Yankey*, Northwestern was more than a general supervisor of the job. Northwestern gave orders, kept continuous supervision and had the right to discharge any worker. Northwestern exercised control over the entire construction project and in particular over Weinreich. Although some facts give rise to an inference that Weinreich was the employee of Reitzel, *i.e.*, he was hired and paid by Reitzel, and he was doing electrical work at the time of the accident, there was sufficient evidence to support the jury's conclusion that Weinreich was a loaned employee. Thus, we find that the trial court did not err in refusing to set aside the verdict and the special interrogatories and in refusing to substitute its judgment for that of the jury. Based on the foregoing determination, we conclude that the trial court did not err in

refusing to enforce the express indemnity provision in the purchase order agreement. Since Weinreich was Northwestern's employee, Reitzel had no obligation under the agreement to indemnify Northwestern.

■■■■■■ Northwestern further contends that Reitzel had a duty to indemnify under a theory of implied indemnity because Northwestern was only passively negligent whereas Reitzel was actively negligent. It is true that under the Structural Work Act more than one person may be "in charge of" the work and be liable to an injured party. (*Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 123, 373 N.E.2d 1348.) Further, there can be degrees of fault among those who are liable under the Act, and the passively delinquent party, if held accountable, may transfer its statutory liability to the actively delinquent party. (*McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93, 104, 338 N.E.2d 868; *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 291-92, 226 N.E.2d 630.) A person has "charge of" the work and is subject to liability under the Act if the person exercises control or possesses the right to control whether or not exercised. (*Emberton,* at 119.) Whether a person has charge of the work is a question of fact for the jury. (*McInerney,* at 101; *Voss v. Kingdon & Naven, Inc.* (1975), 60 Ill. 2d 520, 525, 328 N.E.2d 297.) The Illinois Supreme Court recently held in *Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 394 N.E.2d 403, that based on the totality of circumstances the owner of the work site was sufficiently "in charge of" the construction to justify the jury's finding of liability. The owner supervised the work, made daily inspections, ordered and approved all changes and had a right to stop the work after 10 days notice. Similarly in the case at bar, the evidence presented was sufficient to sustain the jury's verdict. As previously discussed, the evidence showed that Northwestern possessed control and in fact exercised control over the work. Further, we find that the answer to the special interrogatory was not inconsistent with the evidence at trial and that there was sufficient evidence to support the jury's finding that there was not misconduct by Reitzel of a quality greater in degree or character than that of Northwestern. We cannot say that the evidence so overwhelmingly favored Northwestern as to justify reversal of the jury verdicts and the trial court, nor that the decision is contrary to the manifest weight of the evidence.

Finally, Northwestern contends that the trial court erred in denying Northwestern's motion to vacate the judgment in favor of plaintiffs and to dismiss the action pursuant to a stipulation between plaintiffs and Northwestern. Reitzel contends that denial of the motion was proper and not an abuse of the court's discretion because the attorney for Northwestern did not inform the court that Northwestern had received a satisfaction of judgment from plaintiffs.

The record indicates that judgment was entered against Northwestern on September 12, 1977. On October 24, 1977, counsel for Northwestern made a motion that the principal action be dismissed and the judgment vacated pursuant to a stipulation between plaintiffs and Northwestern, which counsel submitted to the court. Counsel for Northwestern informed the court that Northwestern paid $215,000 to plaintiffs, and plaintiffs executed a general release in favor of Northwestern. The judge asked counsel why the case was not settled on receipt of a satisfaction of judgment, and counsel replied that the parties "chose to do it" differently. The trial judge denied the motion stating that if the action was merely between Northwestern and plaintiffs, he would not hesitate to vacate the judgment; however, since a third-party action was involved, he felt a different matter was involved and to enter the order because the parties "chose to do it that way" was not a realistic approach.

On November 4, 1977, further hearings were held, and the court was informed that a satisfaction of judgment had been received by Northwestern on September 30, 1977. The court then stated that the representations made by counsel for Northwestern were "something less than candid" and the court continued the matter so that counsel for Northwestern and counsel for plaintiffs (who was not present) could explain the matter. On November 14, 1977, a further hearing was held, and plaintiffs' attorney informed the court that plaintiffs executed both a release and a satisfaction of judgment but that Northwestern did not want the satisfaction of judgment to be entered because he thought it would have an estoppel effect on the third-party action. Northwestern's counsel admitted receiving the satisfaction of judgment and having such in his possession on October 24, 1977, when he first presented the motion to vacate. The court then stated to counsel for Northwestern:

> "It appears now very certainly that on October 24th when you asked me to vacate the judgment, when you told me that you would not accept a Satisfaction of Judgment, you already had, in fact, accepted a Satisfaction of Judgment, three weeks earlier. It was already in your possession. And I have some—some doubts about the accuracy about those representations to say the least.
>
> And I want the record to reflect that it is my feeling now, and I want you to have every opportunity to reject it, to modify it, that it was not a very candid expression to the Court.
>
>          \*   \*   \*
>
> And I have given you every opportunity to present your position to me, \* \* \* and this is one of the most distasteful things that I have ever encountered, that an officer of this court has played rather loosely with the truth in making representations to the court.

It is also distasteful, * * * that a friend of long standing would take that position as an officer of the Court, particularly to this Court.

And I have many alternatives open to me. I do not choose to exercise any of those. And yet, my feeling is that your conduct has been contumacious. Because you have injected into this proceeding some technical, even if it can be called that, interpretation of what our Supreme Court has defined a Satisfaction to be, you've seemed to stand on that technicality that you have not satisfied it, and that it has been released, and that the Satisfaction of Judgment in your possession is really—in fact— a nullity—I cannot accept that.

And I suppose that I am not being fair to the Court's position because I really and truly feel that the integrity of this Court has been offended."

The court then denied the motion to vacate the judgment and dismiss the action.

■ The policy of courts is to enforce stipulations fairly made relating to the conduct of litigation unless good reason is shown to the contrary. (*Roin v. Checker Taxi Co.* (1962), 36 Ill. App. 2d 447, 451, 184 N.E.2d 736.) Although it is true, as Northwestern contends on appeal, that a settlement between a plaintiff and defendant does not bar a third-party action for indemnity (*Krambeer v. Canning* (1962), 36 Ill. App. 2d 428, 184 N.E.2d 747), the trial court was presented no authority for dismissing the action even though it requested such from counsel for Northwestern. Further, the record supports the trial court's statements that counsel was not completely candid with the court and made representations that were not completely accurate. Thus, we find that the trial court did not abuse its discretion in refusing to enforce the parties' stipulation and in denying the motion to vacate the judgment and dismiss the action.

Based on the foregoing we affirm the judgment of the circuit court of Cook County.

Affirmed.

STAMOS, P. J., and DOWNING, J., concur.