THE COUNTY OF TAZEWELL, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Ruth Morris *et al.*, Appellees).—R.A. CULLINAN & SONS, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Ruth Morris *et al.*, Appellees).

Fourth District (Industrial Commission Division)   Nos. 4—89—0170WC, 4—89—0201WC cons.

Opinion filed December 29, 1989.—Rehearing denied February 21, 1990.

310

Quinn, Johnston, Henderson & Pretorius, of Peoria (John J. Waldman and Charles D. Knell, of counsel), for County of Tazewell.

Nathan R. Miller, of Prusak & Winne, Ltd., of Peoria, for R.A. Cullinan & Sons, Inc.

James Walker, Ltd., of Bloomington, for appellee Ruth Morris.

JUSTICE WOODWARD delivered the opinion of the court:

Ruth Morris (Ruth), widow of Ernest Morris (Ernest), filed a separate application for adjustment of claim against each of the respondents, R.A. Cullinan & Sons, Inc. (Cullinan), and the County of Tazewell (Tazewell). These claims against Cullinan and Tazewell were eventually joined. Ernest was found dead at the wheel of a snowplow that he had been driving on April 9, 1982. The arbitrator found that there was no causal connection between Ernest's death and his employment. Having so found, the arbitrator did not rule on the issue of whether Tazewell was a borrowing employer and Cullinan a loaning employer. The Industrial Commission (Commission) modified the arbitrator's decision, finding that Ernest's death arose out of and in the course of his employment and that Tazewell was a borrowing employer and Cullinan was a loaning employer. The circuit court of McLean County confirmed the Commission's decision.

Ruth Morris testified to the following at the arbitration hearing. Ernest had worked for over 30 years as a truck driver for Cullinan. Due to a severe snowstorm, Ernest had been plowing snow in a Cullinan truck fitted with a snowplow in the days preceding his death on April 9, 1982. Tazewell records admitted into evidence showed that Ernest drove a snowplow for eight hours on April 5, eight hours on April 6, and 13½ hours on April 8. Ruth testified that on April 8, Ernest arrived home at 8 p.m. He fell asleep immediately on the couch, which was not his usual custom. Ruth awoke Ernest for dinner, after which he returned to sleep on the couch, again contrary to his usual custom. He arose at 3:30 a.m. on April 9 to return to snow plowing. He normally arose at 5:30 a.m. to prepare for work. Ruth noticed that on the evening of April 8, Ernest looked extraordinarily tired when he came home from work. Ruth testified that Ernest did not customarily work in excess of 12 hours, return home at 8 p.m., and then return to work less than eight hours later.

An April 13, 1982, autopsy report, which had been prepared by Dr. Robert Gregorski, was admitted into evidence. Dr. Gregorski determined the cause of Ernest's death "to be probably due to cardiac ar-

rhythmia secondary to cor bovinum (enlarged heart). The heart also showed evidence of old healed rehematic [*sic*] heart disease with mitral insufficiency."

Ernest's regular physician, Dr. Daniel Baer, testified via an evidence deposition taken October 1, 1984. Dr. Baer, a board-certified family practitioner, first treated Ernest in October 1979. Dr. Baer stated that at each examination he found Ernest to have cardiac arrhythmia (irregular heartbeat), he prescribed several medications, Lanoxin and Lasix, to deal with Ernest's heart disease and its symptoms. Dr. Baer last saw Ernest on January 11, 1982, at which time his heart condition was stable.

Dr. Baer opined that stress could exacerbate cardiac arrhythmia. He also stated that Ernest's employment as a snow-plow driver could have aggravated his heart condition and, therefore, could have caused his death.

Dr. David Best, a board-certified cardiologist, testified to the following on behalf of respondents. Ernest died because the electrical activity of his heart "became chaotic and did not effectively send impulses to the heart which would allow it to beat in a fashion that would support life." Ernest's death could have occurred at any time, even during periods of inactivity. An enlarged heart such as Ernest's was prone to developing lethal cardiac arrhythmia. Ernest's smoking did not lead to an enlargement of his heart, but his alcohol consumption may have led to its enlargement. Dr. Best described Ernest as being moderately overweight, a condition which did not cause his enlarged heart.

On cross-examination, Dr. Best stated that he had never examined Ernest. Dr. Best stated that the enlarged heart was caused by an underlying mitral valve disease that Ernest had had for a number of decades. Dr. Best opined that "it would seem that [Ernest] would have had increased fatigue" on the evening of April 8 and the morning of April 9. Dr. Best further stated that such fatigue could or might have been one of the causative factors in the onset of cardiac arrhythmia that Ernest sustained on April 9.

Tazewell initially argues that the Commission's finding that Ernest's employment caused his death was against the manifest weight of the evidence. We disagree.

■■ ■ It is the Commission's duty to determine the facts and to determine whether there was a causal relationship between the employment and the injury. (*County of Cook v. Industrial Comm'n* (1977), 69 Ill. 2d 10.) Where the medical evidence is conflicting as to causation, it is for the Commission to determine which testimony is to be

accepted. (*Illinois Valley Irrigation, Inc. v. Industrial Comm'n* (1977), 66 Ill. 2d 234.) The Commission is entitled to draw reasonable inferences from both direct and circumstantial evidence. Reviewing courts will not disregard those permissible inferences merely because other inferences might be drawn. *Beloit Foundry v. Industrial Comm'n* (1976), 62 Ill. 2d 535.

■ Contrary to respondent's assertions that the Commission's decision is not supported by the evidence, we find the evidence clearly indicates that Ernest's cardiac arrhythmia was caused in part by fatigue related to excessive exertion while plowing snow. Both medical experts, Dr. Baer and Dr. Best, opined that the snow plowing Ernest performed on April 8 could have led to excessive fatigue which, in turn, could have or might have been a contributing factor to his state of ill being. This evidence is analogous to the evidence relied upon by our supreme court in *County of Cook v. Industrial Comm'n* (1977), 69 Ill. 2d 10, to uphold an award of compensation to a worker whose heart attack was due in part to his employment.

Moreover, the evidence shows that Ernest's work schedule on April 8 and 9 was substantially different than his regular course of daily work. He had plowed snow 13½ hours on the 8th, and after an abbreviated and irregular night of sleep, returned to work earlier than was usual for him to continue plowing his assigned roads on the 9th. This work activity was therefore distinguished from Ernest's usual work day. As such, the Commission reasonably inferred that he was subjected to a greater degree of stress than that to which he was normally exposed, and this stress constituted a contributing factor, which aggravated his cardiac arrhythmia. *County of Cook*, 69 Ill. 2d at 19.

We find that the Commission's decision that Ernest's employment contributed in part to his condition of ill-being is not against the manifest weight of the evidence.

■ ■ Respondent Tazewell next argues that the Commission erred in finding that it was a borrowing employer. Initially, we note that the issue of whether an employee has been borrowed by a second employer is a question of fact to be determined by the Commission. (*M & M Electric Co. v. Industrial Comm'n* (1974), 57 Ill. 2d 113, 117.) A court of review will not disturb the Commission's finding on this question unless contrary to the manifest weight of the evidence. The test for determining the loaned employee's status consists of two elements, namely, (1) whether Tazewell had the right to direct and control the manner in which Ernest performed the work; and (2) whether there existed a contract of hire between Ernest and Tazewell. The existence of a loaned employee situation is generally a question of fact to be de-

termined by the Commission. *A.J. Johnson Paving Co. v. Industrial Comm'n* (1980), 82 Ill. 2d 341, 348.

Jack Moser testified on behalf of respondent Cullinan, where he was employed as corporate secretary in charge of data processing and payroll. He stated that the agreement between Tazewell and Cullinan for snow removal was strictly oral and had been in effect for approximately 30 years. The agreement called for Cullinan to provide a truck and driver to plow snow on county roads. Tazewell owned and supplied the plow and paid to mount it on the Cullinan truck. Tazewell also supplied the salt that was spread on the roads. Cullinan paid the driver and was reimbursed by Tazewell for the driver's services and a fee for truck usage.

Mr. Moser further testified that Cullinan did not have an employee who oversaw the driver's snow plowing assignments, which were made by Tazewell. Conversely, Tazewell had an employee whose job it was to supervise plowing the county's roads. Tazewell told the drivers when to commence plowing, when to apply salt, and how many hours to work. Ernest's regular work for Cullinan consisted of driving trucks, primarily to deliver loads of "hot mix."

On cross-examination, Mr. Moser testified that a driver was told by Tazewell which road he would plow during the winter season. Cullinan carried insurance on the truck used for snow plowing.

Terry Gardner testified that he was Tazewell's superintendent of highways. He arranged with Cullinan to have certain roads plowed. The agreement for said services was oral and commenced prior to his tenure with Tazewell. The agreement provided that Cullinan would furnish a truck and driver to plow certain portions of the county's roadways. The agreement was renegotiated each year, as the roads to be plowed by Cullinan changed from year to year. By the winter of 1981-82, due to Tazewell's purchase of snow plowing equipment, Cullinan's position was reduced to that of providing a backup snow plowing unit. In December 1981, one of Tazewell's trucks was damaged, and Tazewell requested that Cullinan furnish a truck and driver for the rest of the winter. Additionally, Mr. Gardner stated that Ernest was never paid directly by Tazewell, nor did the county ever withhold social security, Federal or State income tax from any payments made to Cullinan for services rendered. No county trucks were ever driven by Cullinan employees. Tazewell had no say as to which driver Cullinan furnished.

On cross-examination, Mr. Gardner admitted that Tazewell controlled the snow removal process, which was supervised by one of his assistants.

Tazewell argues that the record provides no support for a finding

that it exercised the type and quality of control which should be required to make it a borrowing employer. Tazewell contends that the record discloses that Ernest was merely told which roads to plow whenever there was a snowstorm. Tazewell further maintains that the record does not establish whether Ernest actually received instructions directly from Tazewell rather than Cullinan. Thus, Tazewell argues that this case is akin to cases in which an employee, in the course of special service, was not controlled by a second employer but merely responded to the instructions of his employer's customer.

Contrary to these assertions, the evidence demonstrates that Tazewell had the right to direct and control the manner in which Ernest performed the work. Tazewell determined when Ernest would plow snow and it set out the particular area which Ernest plowed. Moreover, Tazewell owned the blade used in the plowing of snow and paid for mounting the blade on the Cullinan truck. No evidence indicated that Cullinan directed or controlled Ernest's work as he plowed snow for Tazewell. The fact that Cullinan paid Ernest and was reimbursed by Tazewell is a mere bookkeeping technicality and, in this instance, has no bearing upon the substance of this issue.

As to the second element of the test, *i.e.*, whether a contract existed between Tazewell and Ernest, there is no dispute that there was an oral arrangement between Cullinan and Tazewell whereby Cullinan would furnish a truck and driver to plow assigned areas in the county.

■ Critical to the employment relationship between Ernest and Tazewell is the existence of an employment contract, express or implied. (*Johnson Paving*, 82 Ill. 2d 341.) To establish such a contract, there must be at least an implied acquiescence by the employee in the relationship. (*Johnson Paving*, 82 Ill. 2d 341.) The evidence indicates: that Ernest was aware the snow plowing was being performed by Tazewell; that he accepted Tazewell's control over his work; and that he followed Tazewell's instructions as to what roads to plow, when to plow the roads, and when to stop plowing the roads. The evidence clearly demonstrates Ernest's acquiescence in the relationship.

■ Tazewell cites *Mosley v. Northwestern Steel & Wire Co.* (1979), 76 Ill. App. 3d 710, for the proposition that a person cannot become an employee of the second employer unless the second employer has the power to discharge or fire the employee. Contrary to this assertion, the case law demonstrates that said power to discharge is but one of the factors to be considered in determining employer liability. See *Johnson Paving*, 82 Ill. 2d at 347-48.

■ Moreover, Tazewell argues that an employee in the special service of a second employer cannot be considered a loaned servant unless

he is *wholly free* from the first employer and *wholly subject* to the control of the second employer. (*Richard v. Illinois Bell Telephone Co.* (1978), 66 Ill. App. 3d 825.) Tazewell's reliance on *Richard* is misplaced. *Richard* is a personal injury case, involving negligence of a loaned employee, rather than a workers' compensation action. In *Johnson Paving*, our supreme court stated:

> "We have long recognized the borrowed-employee doctrine as being applicable to cases arising under the Workmen's Compensation Act. [Citations.] In so recognizing we have also deemed in compensation cases the *most dominant circumstance in identifying the employer \*\*\* to be the right to control the manner in which the work is to be done.* [Citations.]" (Emphasis added.) (*Johnson*, 82 Ill. 2d at 347.)

Clearly, the standard put forward in *Richard* and relied upon by Tazewell is not applicable in workers' compensation actions.

For reasons stated above, we find that the Commission's decision that Tazewell was the borrowing employer is not against the manifest weight of the evidence.

Accordingly, we affirm the judgment of the circuit court.

Affirmed.

BARRY, P.J., and McNAMARA, McCULLOUGH, and LEWIS, JJ., concur.