**Mitchell T. RUSSELL and Barbara A. Russell, Plaintiffs–Appellants,**

v.

**PPG INDUSTRIES, INC., Defendant–Appellee.**

No. 90–3121.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1991.

Decided Jan. 9, 1992.

*Id.* at 497. Certainly, a reasonable factfinder could conclude that such was the case.

Jeffrey D. Frederick, Johnson, Frank, Frederick & Walsh, Urbana, Ill., D. Jeffrey Ezra (argued), Jon G. Carlson, Carlson & Associates, Edwardsville, Ill., for plaintiffs-appellants.

Timothy J. Forman, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Urbana, Ill., Matthew J. Maddox (argued), Hinshaw & Culbertson, Springfield, Ill., for defendant-appellee.

Before CUMMINGS, FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Mitchell Russell was injured September 26, 1986, while working at the PPG Industries, Inc. (PPG) plant in Mt. Zion, Illinois. Russell was employed at the time by Perry Steel Construction Company, Inc. (Perry), which had contracted with PPG to construct, install, and perform on-site repairs to new production process equipment at the plant. His duties generally consisted of such activities as pouring concrete, operating a jack-hammer, masonry, and clean-up work.

Occasionally, Russell worked with PPG engineers on a glass furnace testing project which was outside the scope of the construction and repair contract. The project was conducted in a restricted area of the plant, and workers assigned to it required security clearances and received special training. Because of the special training required, PPG often would request specific Perry workers who had previously worked on the project. PPG typically would inform a Perry foreman that it needed a certain number of workers for a particular day and the foreman, in turn, would notify those workers on the day that they were to assist PPG with the furnace testing.

Russell was working on the furnace testing project when he was injured. During the testing he supported himself by placing his hand on an I-beam running above the furnace. As he leaned against the beam, his hand touched a high-voltage electric power bar, resulting in the injury that prompted this lawsuit. Russell brought this diversity action against PPG alleging negligence, violation of the Illinois Structural Work Act, willful and wanton misconduct, and intentional tort. His wife joined in the complaint, alleging loss of companionship, consortium, and support. The District Court granted summary judgment to PPG.

On appeal, Russell contends that the court erred in finding that he was a "loaned employee" of PPG at the time of his injury and therefore barred by the Illinois Workers' Compensation Act (IWCA) from suing PPG for common-law or statutory remedies grounded in negligence. He also asserts that he alleged sufficient facts to support his intentional tort claim. We affirm.

I.

The IWCA makes provision for "loaning" and "borrowing" employers. *See* Ill.Rev.

Stat. ch. 48, ¶ 138.1(a)(4). When one employer loans an employee to another employer, the borrowing employer is primarily liable for compensation if the loaned employee is injured in the course of employment. *Id.* A loaned employee may not sue the borrowing employer for common-law or statutory remedies and is limited to recovery under the Act. *Id.* ¶ 138.5; *see Saldana v. Wirtz Cartage Co.*, 74 Ill.2d 379, 24 Ill.Dec. 523, 527, 385 N.E.2d 664, 668 (1978).

In granting summary judgment to PPG, the District Court determined as a matter of law that Russell was a loaned employee of PPG. Although such a determination is ordinarily a question of fact, "if the undisputed facts permit but a single inference," the question can be characterized as one of law. *A.J. Johnson Paving Co. v. Industrial Comm'n*, 82 Ill.2d 341, 45 Ill.Dec. 126, 130, 412 N.E.2d 477, 481 (1980). Our task is to determine whether a triable issue of fact is presented on this record. *See Trenholm v. Edwin Cooper, Inc.*, 152 Ill.App.3d 6, 105 Ill.Dec. 61, 62, 503 N.E.2d 1067, 1068 (5th Dist.1986).

As a threshold matter, Russell asserts that PPG cannot maintain the "borrowing employer" defense unless Perry Steel is a "loaning employer" as explicitly defined by the relevant statute.[1] We disagree. As PPG correctly points out, the IWCA "provides *a* definition of loaning employer; it does not provide the *only* definition of loaning employer." Appellee's Br. at 29 (emphasis in original). The statute does not preclude other employers, who are not in the business of hiring, procuring, or furnishing employees, from claiming the defense. It merely removes the need for further inquiry into status when employers falling within the explicit statutory definition are involved.

Because Perry is not, by definition, a loaning employer, further inquiry is required. Illinois law provides that two pri-

mary factors determine whether a loaned employee relationship exists: (1) whether the borrowing employer had the right to direct and control the manner in which the plaintiff performed the work; and (2) whether a contract of hire, either express or implied, existed between the plaintiff and the defendant. *A.J. Johnson*, 45 Ill. Dec. at 130, 412 N.E.2d at 481; *Gundich v. Emerson–Comstock Co.*, 21 Ill.2d 117, 171 N.E.2d 60, 63 (1960). Of the two, the right to control is primary. *A.J. Johnson*, 45 Ill.Dec. at 129, 412 N.E.2d at 480 ("The main criterion for determining when a worker becomes a loaned employee is whether the special employer has control of the employee's services.") (quoting *Saldana*, 24 Ill.Dec. at 527, 385 N.E.2d at 668). As a general rule, the Act "should be liberally construed to bring persons within the term 'employer-employee.'" *Saldana*, 24 Ill.Dec. at 528, 385 N.E.2d at 669 (citing *Allen–Garcia Co. v. Industrial Comm'n*, 334 Ill. 390, 166 N.E. 78, 80 (1929)). We examine each factor in turn.

### A.

Whether an employer has "control" over an employee's work depends upon the character of the supervision of the work done, the manner of direction of the servant, the right to discharge, the matter of hiring, and the mode of payment. *Saldana*, 24 Ill.Dec. at 528, 385 N.E.2d at 669; *Freeman v. Augustine's, Inc.*, 46 Ill. App.3d 230, 4 Ill.Dec. 870, 873, 360 N.E.2d 1245, 1248 (5th Dist.1977). In finding that PPG had the right to control the manner in which Russell worked, the District Court noted that Russell reported to Walt Bisline, a PPG employee, and that Bisline instructed Russell how to test the furnace, had the authority to send back to Perry any PPG employees he found unsatisfactory, directed when Russell took breaks, and authorized Russell's overtime.

---

**1.** The IWCA defines "loaning employer" as one whose business involves hiring, procuring or furnishing employees to or for other employers operating under and subject to the provisions of [the IWCA] for the performance of the work of such other employers and [paying] such employees their salary or wages notwithstanding that they are doing the work of such other employers.
Ill.Rev.Stat. ch. 48, ¶ 138.1(a)(4).

■ In arguing against the court's finding, Russell relies heavily on the fact that he received his salary from Perry, not PPG, and that Perry withheld taxes and insurance benefits from Russell's checks. While mode of payment is relevant in determining control, *Saldana*, 24 Ill.Dec. at 528, 385 N.E.2d at 669, it is not determinative. "The mere fact that the employee does not receive his wages from the special employer will not defeat the finding of a loaned-employee situation." *A.J. Johnson*, 45 Ill. Dec. at 130, 412 N.E.2d at 481. *Cf. Allen–Garcia Co.*, 166 N.E. at 81 (fact that borrowing employer did not pay employee's wages "would not determine that he was not its employee."). Rather, "[t]he question of who pays an employee's wages is only one factor to be considered along with other factors in determining whether an employment relationship exists." *Dildine v. Hunt Transp., Inc.*, 196 Ill.App.3d 392, 143 Ill.Dec. 94, 96, 553 N.E.2d 801, 803 (3d Dist.1990). Although *Dildine* involved a joint, rather than loaned, employee scenario, its reasoning is also applicable here. We must determine whether the "totality of the relevant factors" requires a finding that PPG controlled Russell's work. *Id.*

■ Although Russell was not paid directly by PPG, PPG's mode of payment in reimbursing Perry for work on the furnace project militates in favor of a finding of control. Employee time on the furnace testing project was not included in the general, reimbursable construction contract between Perry and PPG, but rather was billed separately and set up on a special purchase order. Perry billed PPG for the number of people on the project times the

hourly rate, plus a profit factor. Thus, Perry billed PPG for the number of hours Russell worked for PPG on the project, and the amount Perry charged included the salary Perry paid to Russell plus a profit factor. Such an arrangement undercuts Russell's argument. *See Highway Ins. Co. v. Sears, Roebuck & Co.*, 92 Ill.App.2d 214, 235 N.E.2d 309, 313 (1st Dist.1968) (in finding loaned employee relation, court noted that general employer had resigned full control of plaintiff for time being, and was merely "conduit" through which employees were paid); *see also Allen–Garcia*, 166 N.E. at 81.

Russell further contends that he was not a loaned employee because he was not "wholly free" from Perry's control and "wholly subject" to PPG's control during the relevant time period. *Richard v. Illinois Bell Telephone Co.*, 66 Ill.App.3d 825, 23 Ill.Dec. 215, 222, 383 N.E.2d 1242, 1249 (1st Dist.1978); *Freeman*, 4 Ill.Dec. at 872, 360 N.E.2d at 1247. The facts indicate otherwise. Walt Bisline told Russell when to report to work, and set his hours and break times (which often differed from his usual hours and break times with Perry). When working with Bisline, Russell reported directly to him and received orders and directions only from him and other PPG personnel. Moreover, Russell admitted in his deposition that he was under Bisline's, not his labor foreman's, supervision, "took [his] orders from" Bisline,[2] and considered Bisline his supervisor. Russell Deposition at 20–23. Russell's deposition shows that Bisline's authority over him was exclusive:

Q: When you worked for Walt [Bisline], did you report in the ordinary way or

---

2. The deposition of Robert Lawhon, an engineer with PPG, further supports a finding of authority.

A: They would come to us in the morning as individuals without a supervisor, and we would tell them what to do for that period of time, whether it would be a few hours or for the whole day. In some cases, we supplied the tools and equipment that they used. In other cases they supplied some of their own from Perry's tool boxes.

Q: Was it your understanding and agreement with [Perry] that once these individuals were delivered to you or to the other PPG supervisory personnel to whom they might be

directed to report that they would be under their exclusive direction and control for whatever period of time you wanted them?

A: Yes.

Q: Would it be fair to say that in terms of the depth temperature measurements that any employee supplied there would be under the direction and control of the [PPG] personnel involved in those tests?

A: Yes.

Lawhon Deposition at 19–20. Additionally, Perry's president, Ivan Perry, Jr., stated that Russell was under the "direction and training" of PPG personnel while working on the furnace testing project. Perry Deposition at 10.

did you go directly to where he had told you to go?

A: I went directly where Walt told me to.

Q: When you got there in the morning, was he there?

A: Always.

Q: Did you work without him being there?

A: No.

Q: Were there ever occasions when you were supposed to be working for Walt and he was not there for some reason, then would you go back to your ordinary job or would you wait for him to arrive?

A: I would wait for Walt. I was assigned to him.

Q: When you were assigned to him. Could your foreman tell you to work for somebody else if you had some free time?

A: No.

Q: Why was that?

A: Because I was assigned to him. Whenever he wanted me, I was to be available.

Russell Deposition at 32. These facts strongly support a finding that PPG, through Bisline, had "actual control over [Russell's] manner of doing the work." *Mosley v. Northwestern Steel and Wire Co.*, 76 Ill.App.3d 710, 31 Ill.Dec. 853, 861, 394 N.E.2d 1230, 1238 (1st Dist.1979).

Russell also argues that he could not have been a loaned employee of PPG because PPG did not have the power to terminate his employment with Perry. This argument requires too strict a construction of the term "discharge." Illinois law does not require PPG to have the power to terminate Russell's employment *altogether;* it requires only that PPG have the power to discharge Russell from his work *with PPG.* In *Evans v. Abbott Products, Inc.,* 150 Ill.App.3d 845, 104 Ill.Dec. 78, 502 N.E.2d 341 (1st Dist.1986), for example, the court held that because the borrowing employer

had the authority to dismiss the loaned employee from his temporary job and direct him to report back to the loaning employer, the right to discharge element was satisfied. *Evans,* 104 Ill.Dec. 78, 81, 502 N.E.2d 341, 344 (1st Dist.1986); *see also Freeman,* 4 Ill.Dec. at 874, 360 N.E.2d at 1249 (where plaintiff, general employee of motor lodge, worked in laundry room of the defendant restaurant, it was sufficient that the borrowing employer could "discharge" the employee by barring her from the laundry room). Here, Russell admitted that Bisline had the right to send him back to his regular job with Perry if his work was unsatisfactory. Russell Deposition at 22.[3]

Finally, Russell's job functions when working on the furnace testing project favor a finding of control. "A change in the nature of one's work from the usual work done for the first employer to some special or different work done for the second employer indicates a loaned-employee relationship." *Mosley,* 31 Ill.Dec. at 861, 394 N.E.2d at 1238. Russell admits that the nature of his work at PPG differed from his work at Perry, that it was more dangerous than his routine work, and that it required different safety equipment. Russell Deposition at 20–24.

Taken together, the various factors show that PPG had the right to direct and control the manner in which Russell performed his work while he was assigned to the furnace testing project. We find that PPG, and not Perry, controlled Russell's services during the relevant time period.

**B.**

We next determine whether a contract of hire existed between Russell and PPG at the time of the accident. Russell argues that he "never expressly or explicitly contracted with PPG to accept new employment," Appellant's Br. at 20, and likewise did not impliedly acquiesce to such a relation. Although he is correct in assert-

---

**3.** Although no formal written agreement was in place, PPG previously had exercised a "right to reject" individuals working on the furnace project. Lawhon Deposition at 32. Perry's president also stated that PPG had the power to refuse any employees on the project and send them back to Perry. Perry Deposition at 15.

ing that no explicit contract existed, we find that he acquiesced to a contract of hire with PPG.

Russell first argues that, to find that a contract of hire existed, he must explicitly have contracted with PPG to accept new employment. Such an approach requires too formalistic an interpretation of "acceptance." A meeting of the minds is all that is required for contract formation; an *express* contract is not necessary. Indeed, the relevant case law pertaining to loaned employees requires only "an implied acquiescence by the employee in the relationship." *A.J. Johnson*, 45 Ill.Dec. at 130–31, 412 N.E.2d at 481–82; *see also O'Laughlin v. Servicemaster Co., Ltd.*, 216 Ill.App.3d 27, 159 Ill.Dec. 527, 534, 576 N.E.2d 196, 203 (1st Dist.1991) (employee's express or implied acquiescence "essential" to loaned employee relationship); *Evans*, 104 Ill.Dec. at 81, 502 N.E.2d at 344 ("Plaintiff's consent to the employer-employee relationship is shown from his acceptance of [defendant's] control and direction as to his work activities.").

Alternatively, Russell maintains that whether he acquiesced to a contract of hire with PPG is "questionable" given that his failure to take Perry's orders to work on the project would have resulted in his discharge. His deposition belies this contention:

Q: My question is why did you agree to go to work for Walt [Bisline] if it was so dangerous?

A: Walt was careful. There were some things that can't be helped. I agreed to go to work for Walt because this was my assigned job.

Q: And you didn't have any disagreement with doing that?

A: I could have said, no, and went home.

Russell Deposition at 94–95. Russell also argues that he could not have acquiesced to a contract with PPG because "[c]learly, he was never made aware of a change in his employment." Appellant's Br. at 21. Russell did, however, understand that he was going to work for PPG on a special project. When asked whether he understood that when he went to work for Bisline "this was a temporary assignment and then you would go back to your regular function," Russell responded yes. Russell Deposition at 95.

In *A.J. Johnson Paving Company, supra,* the court held that acquiescence was shown where the employee was aware that the project to which he was assigned was being performed by the borrowing employer and the employee had accepted the borrowing employer's control over the work. *A.J. Johnson,* 45 Ill.Dec. at 131, 412 N.E.2d at 482. Similarly, *County of Tazewell v. Industrial Comm'n,* 193 Ill.App.3d 309, 140 Ill.Dec. 154, 159, 549 N.E.2d 805, 809 (4th Dist.1989), held that an employee had impliedly acquiesced when he was aware that the job on which he was working was being performed by the borrowing employer, accepted that employer's control over his work, and followed that employer's instructions regarding where and how to work.

Russell clearly was aware that the furnace testing project was being conducted by PPG, and accepted PPG's control over his work. His statements and actions show cognizance of an employment relation with PPG. Because we find that PPG directed and controlled the manner of Russell's work when the injury occurred and that an implied contract of hire existed between them, we affirm the District Court's determination that Russell was a loaned employee of PPG.[4]

## II.

█ In granting summary judgment to PPG on the intentional tort count, the District Court found that Russell had presented insufficient facts to show that PPG knew a substantial likelihood existed that

---

4. We find no merit in Russell's claim that the District Court's grant of summary judgment was *sua sponte* and therefore improper. *See Macon v. Youngstown Sheet & Tube Co.,* 698 F.2d 858, 861 (7th Cir.1983) (district courts lack power to enter summary judgment *sua sponte* only when party against whom summary judgment was entered "did not have adequate notice and a fair opportunity to present evidence in opposition to the entry of summary judgment.").

he would be injured.[5]  Russell contends that the court incorrectly equated "substantial likelihood" with "near certainty," thereby forcing Russell to meet a standard not required by existing Illinois law.  We disagree.

■ The District Court relied largely upon *Rockford Redi–Mix v. Teamsters Local 325*, 195 Ill.App.3d 294, 141 Ill.Dec. 805, 812, 551 N.E.2d 1333, 1340 (2d Dist.1990), which held that employees had acted intentionally when they let cement sit in their employers' cement trucks when the drums had ceased turning, knowing that the cement would harden.  In so holding, the *Rockford* court cited the *Restatement (Second) of Torts* § 8A, which states that all consequences which an actor desires to bring about, or those which an actor knows are certain or substantially certain to result from an act, are intentional.  *Restatement (Second) of Torts* § 8A comment b, at 15.  Although the District Court noted that *Rockford* and the *Restatement* "indicate that 'substantial likelihood' is synonymous with 'near certainty,' " *Russell v. PPG Indus., Inc.*, No. 87–2488, slip op. at 6 (C.D.Ill. Aug. 24, 1990), it based its decision not on this semantic exercise, but on that fact that Russell had pointed to no facts in support of his claim that PPG knew there was a substantial likelihood that Russell would be injured.  *Id.* at 7.

As the District Court correctly observed, although the facts show that PPG knew that workers often leaned against the I-beam while testing the furnace and that the power bar was close to the beam, the facts also show that workers had done this without incident for two years.  Although PPG failed to warn of any potential danger, these facts do not support an inference—even under a loose interpretation—that PPG knew there was a "substantial likelihood" of injury.  Moreover, Illinois courts apply a stricter standard for intentional tort claims than that urged by Russell.  *See Collier v. Wagner Castings Co.*, 81 Ill.2d 229, 41 Ill.Dec. 776, 408 N.E.2d

198 (1980) (employer must have directed, encouraged, or committed the intentional torts alleged to escape exclusive remedy provision of the Act).  Accordingly, we affirm the grant of summary judgment to PPG on the intentional tort claim.

### III.

■ In an effort to support Russell's contention that he was not a loaned employee of PPG, his attorney attempted to disclose to this Court information from a summary jury trial in which the parties had participated.  His actions did not bolster his claim or help his client.

The District Court rendered its decision after Russell and PPG had voluntarily participated—and we emphasize voluntarily—in a summary jury trial before a magistrate.  Russell did not have to partake in the procedure.  Indeed, this Circuit is unique in holding that a District Court cannot compel litigants to participate in summary jury trials.  *See Strandell v. Jackson County*, 838 F.2d 884 (7th Cir.1987).  When the judge in this case suggested that the parties participate in the process, Russell could have refused.  He did not.  He chose to play the game and, having done so, must live by the rules.

As counsel for Russell acknowledged at oral argument, one of those rules was an understanding, going in, that the verdict would be kept "under wraps."  Despite this understanding, however, he revealed it to this Court.  Such behavior does not augur well for the use of summary jury trials.  Whatever the merits of the procedure (and the reviews are mixed—*compare, e.g.,* Posner, *The Summary Jury Trial and Other Methods of Alternative Dispute Resolution: Some Cautionary Observations*, 53 U.Chi.L.Rev. 366 (1986) *and McKay v. Ashland Oil, Inc.*, 120 F.R.D. 43 (E.D.Ky.1988) (Bertelsman, J.), any potential they might have as a settlement tool will be undermined if the parties who participate do not adhere to the basic strictures of the process.

---

5.  The exclusivity provisions of the IWCA do not bar a common-law cause of action against an employer for injuries which the employer intentionally inflicts upon an employee, or which were commanded or expressly authorized by the employer.  *See Meerbrey v. Marshall Field and Co.*, 139 Ill.2d 455, 151 Ill.Dec. 560, 564, 564 N.E.2d 1222, 1226 (1990); *see also Collier v. Wagner Castings Co.*, 81 Ill.2d 229, 41 Ill.Dec. 776, 408 N.E.2d 198 (1980).

The purpose of the summary jury trial is "to motivate litigants toward settlement by allowing them to estimate how an actual jury may respond to their evidence." *Strandell,* 838 F.2d at 884; *see Cincinnati Gas & Elec. Co. v. General Elec. Co.,* 854 F.2d 900, 903 (6th Cir.1988), *cert. denied,* 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989). The device is "designed to provide a 'no-risk' method by which the parties may obtain the perception of six jurors on the merits of their case without a large investment of time or money." Lambros, *The Summary Jury Trial and Other Alternative Methods of Dispute Resolution, A Report to the Judicial Conference of the United States Committee of the Operation of the Jury System,* 103 F.R.D. 461, 469 (1985). According to its architect, Judge Thomas Lambros, "[i]f one or both parties feel the result of the jurors' deliberations is grossly inequitable, the right to proceed to a full trial is in no way prejudiced." *Id.* at 482. The potential for risk in this "no-risk" procedure would increase significantly if confidentiality could be disregarded and information gleaned from the process used in later proceedings.[6]

The summary jury trial in no way mirrors a full trial on the merits. It is a nonbinding, mock trial. Abbreviated procedures and evidentiary flexibility are its mainstays. A summary jury listens only to lawyers' arguments, which, unless corroborated, are not regarded as trial evidence. Even where it finds no liability, the mock jury may assess damages, and may hold informal discussions with counsel after the advisory verdict is rendered. "At every turn the summary jury trial is designed to facilitate pretrial settlement of the litigation, much like a settlement conference." *Cincinnati Gas & Elec. Co.,* 854 F.2d at 904. *Cf. McKay,* 120 F.R.D. at 46 (because it is purely a settlement technique, "[n]o presumption of correctness attaches to the verdict of the summary jury, nor is any

sanction imposed for failure to accept its advisory verdict."). Settlements, offers to settle, and settlement negotiations are all inadmissible to prove liability under the Federal Rules of Evidence. Fed.R.Evid. 408. Were we to allow parties to offer information from the summary jury trial to this Court, its utility as a settlement device would be significantly undermined and parties' willingness to participate in the process substantially decreased.

Courts conduct summary jury trials with the cooperation of the parties. Given that participation in the procedure is voluntary in this Circuit, we suggest that those who do so abide by the rules. It is inappropriate to attempt to bring to this Court's attention information which obviously was intended to remain within the confines of the summary jury trial process.

AFFIRMED.

---

6. Indeed, commentators have stressed the closed nature of the summary jury trial. *See, e.g.,* Spiegel, *Summary Jury Trials,* 54 U.Cin. L.Rev. 829, 831 (1986) ("neither the jury findings nor any statement of counsel during the summary jury trial are admissible on the trial on the merits or may be construed as judicial admissions."); Tillotson, Note, *Summary Jury*

*Trials: Should the Public Have Access?,* 16 Fla. St.U.L.Rev. 1069, 1073–74 (1989) ("It is viewed solely as a technique for facilitating settlement. Thus, neither the jury findings nor any statement by counsel made during the summary jury trial are admissible in a future trial on the merits.").