572

Paul M. CROMER, Plaintiff,

v.

JOSEPH BEHR & SONS,
INC., Defendant.

JOSEPH BEHR & SONS, INC.,
Third–Party Plaintiff,

v.

A.P. GREEN INDUSTRIES, INC., A.P.
Green Services, Inc., and Certified In-
dustrial Technologies, Inc., Third–Party
Defendants.

No. 90 C 20215.

United States District Court,
N.D. Illinois, W.D.

Feb. 1, 1994.

Marc M. Pekay, Chicago, IL, for plaintiff.

Thomas H. Boswell, Hinshaw & Culbertson, Rockford, IL, for Joseph Behr & Sons, Inc.

Neil D. O'Connor, O'Connor, Schiff & Myers, Chicago, IL, Eugene E. Brassfield, Brassfield, Cowan & Howard, Rockford, IL, Patricia A. O'Connor, Law Offices of Patricia A. O'Connor, Chicago, IL, for defendants.

## *MEMORANDUM OPINION AND ORDER*

REINHARD, District Judge.

### INTRODUCTION

Plaintiff Paul M. Cromer filed a two-count complaint against defendant Joseph Behr & Sons, Inc. ("Behr") on July 18, 1990, based upon personal injuries he suffered while relining a furnace owned by Behr. Count I asserts liability under Illinois negligence law, alleging Behr agents breached their duty of care not to create an unsafe worksite. Count II asserts liability under the Illinois Structural Work Act, 740 ILCS 150/1–9 (1993), alleging that as an owner having charge of work on a structure, Behr violated its duty to provide a safe, suitable, and proper ladder or support. Cromer invokes this court's jurisdiction on the basis of diversity of citizenship, under 28 U.S.C. § 1332, in that he is a citizen of Iowa, residing in Clinton, Iowa and Behr is an Illinois corporation, primarily doing business in Illinois, and in that the amount in controversy exceeds $50,000.

Behr filed a third-party complaint against Certified Industrial Technologies, Inc. ("Certified") and A.P. Green Services, Inc. ("Green"),[1] respectively the contractor and

---

1. Count III of the original third-party complaint named only A.P. Green Industries, Inc. as third-party defendant. On June 9, 1992, Behr filed an amended third-party complaint adding Count IV, which was identical to Count III except that it named A.P. Green Services, Inc. as well. The

subcontractor on the relining of Behr's furnace. Green was Cromer's employer at the time of his injury. Count I of the third-party complaint seeks contribution to Behr by Certified if Behr is held liable to Cromer. Count II seeks indemnification of Behr by Certified if Behr is held liable to Cromer. Counts III and IV seek contribution to Behr by Green if Behr is held liable to Cromer. Previously, this court granted Certified's motion to dismiss Count II. *See* Order of March 23, 1993.

Behr now moves for summary judgment on both counts of the complaint. Certified joins the motion, presenting additional grounds for summary judgment on the Structural Work Act claim.[2]

### FACTS

In ruling on Behr's motion for summary judgment, the court views the facts in the light most favorable to Cromer and makes all reasonable inferences in Cromer's favor. In November of 1988, Behr contracted with Certified to rebuild an aluminum melting furnace on Behr's premises and used by Behr in its business. According to the contract, Certified would "provide all labor with supervision, demolition equipment, steel, refractory, tools and equipment, installed as required to rebuild the furnace." For its part, Behr was to provide, "at no charge to Certified, a full[y] drained furnace, use of a lift truck, debris disposal, unloading, heated storage for refractory material, compressed air, light, power, and 3 men/shift to work with [the] masonry crews during the installation." Further, the contract committed Certified to "carry insurances such as automobile, public liability, general liability, and workers compensation." Certified in turn subcontracted with Green to install the furnace brick. Cromer was a brick mason working for Green on the furnace relining.

The laborers Behr provided under the contract performed several tasks at the direction of Green's brick masons. They retrieved brick and other materials from the storage area and brought them to the brick masons, cleared debris from the work area, and mixed fire clay to be used by the brick masons. According to Cromer's deposition testimony, one of the laborers may have served as their foreman. All direction in what work to do and how to do it, however, came from Green's brick masons. The brick masons had to be careful in the directions they gave the laborers, since the laborers did not have any familiarity with bricklaying practices. The laborers would work continuously for the brick masons when the brick masons were present. They would take their breaks slightly ahead of the brick masons, if the brick masons had all the materials they would need. Cromer at one point stated that at times when they were not assisting the brick masons, the laborers would move iron ingots, a task unrelated to their work for Green.

During the furnace relining, Behr plant manager Jim Butkus would visit the worksite two or three times per day. According to Butkus's affidavit, his only purpose in doing so was to check on the progress of the relining project. Behr had no responsibility for or right to determine Certified's or Green's activities in completing the project. Behr possessed the right to stop work on the project, but never exercised that right. The laborers provided by Behr would work at the direction of Green. According to Butkus, the laborers would work on the relining for the entire shift they were so assigned. Green determined the number of laborers needed on any given shift. When Behr had a concern that the Green brick masons were not putting in sufficient time on the project to complete it on time, this concern was not communicated to the brick masons by Behr. Instead, Behr brought the concern up with Certified's representative, Dave Borow.

The furnace floor was three feet lower than the entrance to the furnace. Entering and leaving could be accomplished in a variety of ways. Cromer preferred to use a six-foot ladder that sometimes was present but stated the laborers would occasionally take it away to use it to acquire materials for the project. When the ladder was missing, Cromer and the other brick masons "would

---

court uses the name "Green" to refer to both entities.

2. Cromer has not objected to Certified joining Behr's motion.

sometimes holler at [the laborers] to get the ladder." Cromer, who was 5'10" and weighed 170 pounds at the time of the accident, testified in his deposition that without the ladder, the only way he could get out of the furnace was to step on one of the five-gallon buckets that were available in the furnace. According to Cromer, to get out of the furnace using a bucket, he would step on the bucket with one foot and then place the other knee upon the ledge and crawl out.

On December 26, 1988, while climbing out of the furnace in this manner Cromer slipped and fell. His primary injury was a torn rotator cuff in his left shoulder, although he alleges other injuries occurred as well. He testified in his deposition that the ladder was not available and the laborers were not present to provide the ladder, so he used the bucket.

Terry Holloway, who worked on the furnace relining and is 6'1" and weighs 270 pounds, testified in his deposition that he would leave the furnace through a different opening than Cromer. In doing so, he would "[c]limb, step up on the skid of bricks, step up on the well, step on another skid of bricks, [and then] on the floor." Thomas Sullivan, a brick mason on the furnace relining who is 6'1" and weighs 200 pounds, testified in his deposition that exiting the furnace was like climbing out of an empty swimming pool. Sullivan's method of climbing out was similar to that used by Cromer; he would step on the bucket and then either step or put a knee up on the ledge. Michael Hopper, a Behr supervisor who, on several days during the project, oversaw a turning dryer near the furnace project site and who is 5'10½", testified in his deposition that there was "no easy access" to the furnace but that there were ways of of exiting and entering other than that used by Cromer. It was Hopper's impression that all of the employees working on the furnace relining project were Green's employees and none were Behr's employees.

Gregory Walters, a foreman for Green on the furnace project, testified in his deposition that there was a ladder present at the furnace worksite of a type provided by Green and that it would have been customary for Green to provide a ladder for the site. Walters also testified that it would have been an unsafe practice for the brick masons or the laborers to use a bucket as a step, that he would have told anyone who did so not to, that repeated use of a bucket as a step could have lead to firing, and that he had not seen anyone use a bucket as a step on the day of Cromer's accident but had seen someone use a bucket as a step previously. Walters, who is 5'10" and weighs 180 pounds, testified in his deposition that his own method for getting down into the furnace was to sit on the ledge and then jump or lower himself down. To climb out, he would boost himself up similar to climbing out of an empty swimming pool.

Eric Pearson, the highest ranking Green supervisor on the project, testified that he was at the furnace job site twice prior to Cromer's accident. While at the site, Pearson would meet with Behr plant manager Butkus, who visited the site two or three times per day. Pearson and Butkus would share information about the project, but Butkus would neither offer advice nor give instructions concerning the project. While at the site, Pearson would also speak with Dave Borow, Certified's representative. According to Pearson, Green's role on the project was "to provide material, labor and equipment to reline the furnace as shown on drawings provided by Certified."

Pearson testified that use of a bucket instead of a ladder for entering and exiting the furnace would not have been an acceptable practice and that if a brick mason had done so and been warned against it, he might be fired if he did so again. Pearson also testified that Green held a safety meeting with its employees before the project started. At that meeting, Walters read the company safety pamphlet and emphasized safety. The pamphlet did not mention the danger in using a bucket to climb out of the furnace, but the brick masons were admonished to use the ladder.

## CONTENTIONS

In regard to Count I, Behr contends that it is not liable for the actions of the laborers it provided to Green under the contract for work on the project because they served as

"loaned employees" under Illinois law. In regard to Count II, Behr contends the Structural Work Act does not apply to it because Behr did not "have charge of" the work performed on the furnace, a requirement for liability under the Structural Work Act.

Cromer contends that the laborers provided by Behr do not qualify as "loaned employees" and that Behr did "have charge of" the furnace relining.

Certified contends the Structural Work Act does not apply because the need for a ladder arose from a voluntary act on the part of Cromer and because Cromer has not shown there was no alternative to use of the substitute for the ladder.

Cromer contends the Structural Work Act requires neither that the need for a ladder not arise from a voluntary act by Cromer nor a showing of no alternative to use of the substitute for the ladder.

## DISCUSSION

■ Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The inquiry to be made on a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

■ In a diversity case such as this one, this court's duty in regard to substantive law is to "apply the state law that would be applied in this context by the Illinois Supreme Court." *Kaplan v. Pavalon & Gifford*, 12 F.3d 87, 89 (7th Cir.1993) (quoting *Green v. J.C. Penney Auto Ins. Co.*, 806 F.2d 759, 761 (7th Cir.1986)). The opinions of Illinois appellate courts are persuasive but not binding authority in determining what the Illinois Supreme Court would do in a given case. *Id.*

## 1. Negligence: Loaned Employee Doctrine

■ Behr contends the laborers it provided to work with the Green brick masons under the contract, who may have been responsible for the ladder not being available at the furnace worksite, qualified as "loaned employees." Under the Illinois loaned employee doctrine, "[a]n employee in the general employment of one person may be loaned to another for the performance of special work and become the employee of the person to whom he is loaned, while performing the special service." *A.J. Johnson Paving Co. v. Industrial Comm'n*, 82 Ill.2d 341, 45 Ill.Dec. 126, 129, 412 N.E.2d 477, 480 (1980) (citing *Saldana v. Wirtz Cartage Co.*, 74 Ill.2d 379, 24 Ill.Dec. 523, 385 N.E.2d 664 (1978)). When an employee has been loaned in this manner, the original employer is no longer vicariously liable for the employee's actions and the loaned employee doctrine serves as a complete defense. *Heinrich v. Peabody Int'l Corp.*, 99 Ill.2d 344, 76 Ill.Dec. 800, 804, 459 N.E.2d 935, 939 (1984); *Occidental Fire & Cas. Co. v. International Ins.*, 804 F.2d 983, 992 (7th Cir.1986). Determining whether the loaned employee doctrine applies is a question of fact unless the undisputed facts permit only one reasonable inference. *M & M Elec. Co. v. Industrial Comm'n*, 57 Ill.2d 113, 311 N.E.2d 161, 163 (1974).

■ The test for whether the loaned employee doctrine applies is "whether or not the employee becomes wholly subject to the control and direction of the second employer and free from the control of the original employer." *Mosley v. Northwestern Steel & Wire Co.*, 76 Ill.App.3d 710, 31 Ill.Dec. 853, 860, 394 N.E.2d 1230, 1237 (1st Dist.1979). In applying this test, the Illinois courts consider a number of factors, including how the employee was directed and supervised, the nature of the work, whether the employee acquiesced to the loan, the method of payment, and the right to discharge. *See id.* The "main criterion" of the test for when an employee has been loaned, however, is whether the second employer has the right to control the employee with respect to the work performed. *A.J. Johnson*, 45 Ill.Dec. at 129, 412 N.E.2d at 480 (quoting *Saldana*,

24 Ill.Dec. at 527, 385 N.E.2d at 668). In other words, "[i]n identifying the employer of an alleged loaned employee, the dominant factor is the right to control the manner in which the work is to be done, and the most significant inquiry is the extent to which the first employer delegated or released to the second employer the right to control." *Mosley*, 31 Ill.Dec. at 860, 394 N.E.2d at 1237.

In the present case, Green possessed the right to control the manner in which the laborers performed their work on the project, and Behr completely delegated this right to Green. The contract terms required Certified (and thus its subcontractor, Green) to "provide all labor with supervision" while Behr provided to Certified (and thus to its subcontractor, Green) "3 men/shift to work with [the] masonry crews." According to Cromer's own testimony, the Green brick masons gave all direction and instruction to the laborers regarding retrieving brick, clearing debris, and mixing fire clay. The laborers had no prior experience with or knowledge of the tasks they were to perform on the furnace relining project. According to Green's highest ranking supervisor, Pearson, it was Green's responsibility to determine the means and methods of all work on the project and Behr retained no right to determine means and methods of work. According to Behr's plant manager, Butkus, Green determined the number of laborers needed on a particular day. Once the laborers were assigned to the project, they would receive no further instruction from Behr regarding their work.

In opposition to all of the above, Cromer can point to only one piece of evidence in the record which might arguably tend to take away from Green's total responsibility over the means and methods of work by the laborers. That evidence consists of Cromer's isolated and unexplained statement in his deposition that at times when they were not doing work for Green, the laborers would move iron ingots, a task unrelated to the furnace relining. This ambiguous statement might be interpreted to contradict the affidavit of Behr plant manager Butkus, if it is read to say that the laborers did not work for Green for an entire shift. Such an interpretation, however, would not only conflict with the other evidence in the record but would also conflict with Cromer's own deposition testimony that the laborers would "continuously" work "for" the Green brick masons once assigned to do so. A better interpretation, and one not conflicting with the rest of his testimony, would be that Cromer was asserting that at some point when the laborers were not working continuously for Green they did incidental tasks for Behr. Such a reading makes sense, in light of Cromer's other statements, such as those regarding the usual timing of breaks by the brick masons and laborers, which support his assertion that the laborers' service on the project was continuous.

Regardless of how Cromer's statement is interpreted, however, it does not by itself undermine the conclusion derived from the rest of the loaned-employee factors or create more than a scintilla of the evidence going the other way. Behr and Certified have established beyond dispute that the laborers Behr provided to Green under the contract performed their work on the furnace relining project according to direction and supervision by Green, who determined the means and methods of all work on the project, even if the laborers did work for Behr when not working on the furnace project and not on the furnace project site. That the laborers may have, at some undisclosed point, done some isolated work for Behr says nothing about whether the second employer, Green, had control of them with respect to the work performed on the furnace relining project. Further, in determining on summary judgment whether a genuine issue of material fact exists, "the rule is well established that the mere existence of some factual dispute will not frustrate an other wise properly supported motion for summary judgment." *Essex Ins. Co. v. Stage 2, Inc.*, 14 F.3d 1178, 1181 (7th Cir.1994). The question is "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it." *Id.* at 1181 (quoting *Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511 (in turn quoting *Improvement Co. v. Munson*, 81 U.S. 442, 448, 14 Wall. 442, 448, 20 L.Ed. 867 (1872))). Even taking

Cromer's statement at its most helpful to him, it would simply be an insufficient basis for a jury finding that the Behr laborers were not under the control of Green in regard to the manner in which the work on the furnace relining was to be done, in light of the rest of the record, including the remainder of Cromer's own testimony.

Thus, the first and most important factor in considering application of the loaned employee doctrine, whether the new employer possessed the right to control the manner in which the work is done and whether the original employer delegated or released that right, points conclusively to the laborers being loaned employees of Green. Such a conclusion finds support in the deposition testimony of Hopper, a Behr supervisor who oversaw a turnings dryer close to the furnace project site on several days during the project. Hopper was under the impression that all of the employees working on the furnace relining project were Green's employees and none were Behr's employees.

None of the other factors considered in applying the loaned employee doctrine take away from this conclusion. First, the nature of the work on the furnace relining project was clearly different from what the laborers would normally do for Behr, since going into the project they had no knowledge of the techniques to be used and, according to Cromer's own deposition testimony, the brick masons had to take into account the laborers' lack of knowledge and experience in giving them instruction. "A change in the nature of one's work from the usual work done for the first employer to some special or different work done for the second employer indicates a loaned-employee relationship." *Mosley*, 31 Ill.Dec. at 861, 394 N.E.2d at 1238 (citing *Freeman v. Augustine's Inc.*, 46 Ill.App.3d 230, 4 Ill.Dec. 870, 360 N.E.2d 1245 (5th Dist.1977)); *Russell v. PPG Indus., Inc.*, 953 F.2d 326, 331 (7th Cir.1992).

■ Second, the Behr laborers impliedly acquiesced to the loan by accepting Green's control and supervision over their work. For an employee to have been loaned, the employee must have formed a new contract of employment with the borrowing employer. *A.J. Johnson*, 45 Ill.Dec. at 130–31,

412 N.E.2d at 481–82. This consideration, however, merely requires that the employee impliedly acquiesced to the new employment situation, which is shown "where the employee was aware that the project to which he was assigned was being performed by the borrowing employer and the employee had accepted the borrowing employer's control over the work." *Russell*, 953 F.2d at 332. In the present case, the laborers accepted instruction from the brick masons and it was certainly readily apparent to the laborers that their work instructions came from Green employees and that Green was in charge of the furnace project site. *See A.J. Johnson*, 45 Ill.Dec. at 131, 412 N.E.2d at 482 (the fact that loaned employee was aware of borrowing employer being in charge of work and accepted borrowing employer's control, in complying with instructions as to starting, stopping, and break times and how to perform work, showed acquiescence to new employment situation).

■ Third, the method of payment does not take away from a finding that Behr loaned the laborers. While it is not disputed that Behr paid the laborers' wages, "[t]he mere fact that an employee does not receive his wages from the [borrowing] employer will not defeat the finding of a loaned employee situation." *A.J. Johnson*, 45 Ill.Dec. at 130, 412 N.E.2d at 481. This is especially true if, as here, the employer was "merely [a] 'conduit'" through which the employee was paid. *Russell*, 953 F.2d at 330 (characterizing and quoting *Highway Ins. Co. v. Sears, Roebuck & Co.*, 92 Ill.App.2d 214, 235 N.E.2d 309, 313 (1st Dist.1968)). In the present case, the contract between Behr and Certified required Behr, who paid for the furnace project, to provide the laborers for the use of Green, who performed the work on the furnace project. In essence, then, the use of the laborers was in lieu of additional payment by Behr to Certified for the furnace relining. Seen in this way, Behr's payment of the laborers' wages was simply as a mere conduit, in that it was a direct offset against the price Certified would charge Behr for Certified's work on the project.

■ Finally, the Illinois courts applying the doctrine generally consider whether the

second employer had a right to discharge the loaned employee, although they place differing emphasis on this factor. *Compare Richard v. Illinois Bell Tel. Co.*, 66 Ill.App.3d 825, 23 Ill.Dec. 215, 222, 383 N.E.2d 1242, 1249 (1st Dist.1978); *with County of Tazewell v. Industrial Comm'n*, 193 Ill.App.3d 309, 140 Ill.Dec. 154, 158, 549 N.E.2d 805, 809 (4th Dist.1990). In the present case, there is no indication whether Green could have actually terminated the employment of any of the laborers. However, "Illinois law does not require [the second employer] to have the power to terminate [the loaned employee]'s employment *altogether*; it requires only that [the second employer] have the power to discharge [the loaned employee] from his work *with [the second employer]*." *Russell*, 953 F.2d at 331 (emphasis in original); *see Evans v. Abbott Products, Inc.*, 150 Ill. App.3d 845, 104 Ill.Dec. 78, 81, 502 N.E.2d 341, 344 (1st Dist.1986). Here, the only relevant facts in the record, that Green determined on a shift-by-shift basis how many laborers would be needed and the complete control over the laborers' work exercised by Green, make an inference of such power reasonable and, more importantly, make the opposite inference, that Green could not have dismissed one of the laborers from work on the furnace lining, unreasonable.

Thus, the "main criterion" identified by the Illinois Supreme Court for determining whether an employee has been loaned from his original employer to a borrowing employer, the right to control the employee with respect to the work performed, points conclusively to the Behr laborers having been loaned to Green. Further, other factors considered in this context either add to or do not detract from this conclusion. The laborers were wholly under the control of Green and wholly free from the control of Behr, and thus any possible negligence on their part cannot be imputed to Behr. For this reason, summary judgment for Behr on Count I, the negligence claim, is appropriate.

## 2. Structural Work Act

Behr contends the Structural Work Act does not apply to it because it did not "have charge of" the work performed on the furnace. The Structural Work Act requires that "[a]ny *owner*, contractor, sub-contractor, foreman or other person *having charge of* the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure" shall comply with the provisions of the Act. 740 ILCS 150/9 (1993) (emphasis added). Under the Structural Work Act, ladders and other supports must be erected or constructed "in a safe, suitable and proper manner" and placed and operated to provide "proper and adequate protection to ... life and limb." 740 ILCS 150/1 (1993).

The Structural Work Act is intended to make liable "those having some responsibility and opportunity to prevent dangerous work methods at the construction site." *Ryan v. E.A.I. Constr. Corp.*, 158 Ill.App.3d 449, 110 Ill.Dec. 924, 929, 511 N.E.2d 1244, 1249 (1st Dist.1987). More than mere ownership of the site of the work is required for liability under the Structural Work Act. *Emberton v. State Farm Mut. Auto. Ins. Co.*, 71 Ill.2d 111, 15 Ill.Dec. 664, 669, 373 N.E.2d 1348, 1353 (1978). In fact, to determine whether a particular defendant "had charge of" the work, a ten-factor totality of the circumstances test is applied. *Coyne v. Robert H. Anderson & Assoc.*, 215 Ill.App.3d 104, 158 Ill.Dec. 750, 752, 574 N.E.2d 863, 865 (2d Dist.1991). This test has been cited with approval by the Illinois Supreme Court. *Id.; see Simmons v. Union Elec. Co.*, 104 Ill.2d 444, 85 Ill.Dec. 347, 350–51, 473 N.E.2d 946, 949–50 (1984) (referring to *Chance v. City of Collinsville*, 112 Ill. App.3d 6, 67 Ill.Dec. 747, 750, 445 N.E.2d 39, 42 (5th Dist.1983)); *see also Damnjanovic v. United States*, 9 F.3d 1270, 1273 (7th Cir. 1993) (applying *Chance* factors); *Savic v. United States*, 918 F.2d 696, 700 (7th Cir. 1990) (same), *cert. denied*, — U.S. —, 112 S.Ct. 62, 116 L.Ed.2d 38 (1991). Thus, a defendant "had charge of" the work if it: (1) supervised and controlled the work; (2) retained the right to supervise and control the work; (3) constantly participated in the ongoing activities at the construction site; (4) supervised and coordinated subcontractors; (5) took responsibility for safety precautions at the jobsite; (6) had authority to issue change orders; (7) had the right to stop the work; (8) owned the equipment at the jobsite; (9) was familiar

with construction customs and practices; and (10) was in a position to assure worker safety or alleviate equipment deficiencies or improper work habits.

*Id.* (quoting *Zukauskas v. Bruning,* 179 Ill. App.3d 657, 662, 128 Ill.Dec. 498, 534 N.E.2d 680 (2d Dist.1989)); *see Chance,* 445 N.E.2d at 42. The "having charge of" issue is primarily a question of fact, although summary judgment is appropriate where there is no question of fact and a party is entitled to judgment as a matter of law. *Cutuk v. Hayes/Gallardo, Inc.,* 151 Ill.2d 314, 176 Ill. Dec. 888, 891, 602 N.E.2d 834, 837 (1992).

In the present case, only one factor can definitively be answered in the affirmative with regard to Behr. Behr readily admits that under the contract it had the authority to stop the work (factor 7), although it did not exercise that power. The other factors which can be definitively answered all weigh against Behr "having charge of" the furnace project. Behr did not supervise and control the work (factor 1). It did not retain the authority to do so (factor 2). It did not supervise and coordinate the subcontractor, Green (factor 4). No authority for Behr to issue change orders appears in the contract (factor 6). Behr plant manager Jim Butkus visited the furnace two or three times per day, but, according to his deposition testimony and that of Green supervisor Eric Pearson, his interest lay only in checking progress on the project. In his deposition Pearson testified that he and Butkus would exchange information about the project when both were present at the site. When asked whether Butkus gave advice or instructions during those conversations, Pearson emphatically answered that he did not.

■ Further, Green, and not Behr, took responsibility for safety precautions at the worksite (factor 5) and was in a position to assure worker safety, alleviate equipment deficiencies, and correct improper work habits (factor 10).[3] These job safety factors are of particular importance in determining whether a defendant "had charge of" a work site. *Damnjanovic,* 9 F.3d at 1273; *Lulich v.*

*Sherwin–Williams Co.,* 992 F.2d 719, 721 (7th Cir.1993). The deposition testimony of Green foreman Gregory Walters indicates that he took active responsibility for safety matters, and specifically did so in regard to the unsafe use of a bucket as a step for climbing out of the furnace. Pearson gave similar testimony. Pearson also stated that Green held a safety meeting before the project began and provided a safety pamphlet to its brick masons. In addition, Walters' testimony indicates Green took responsibility for providing the ladder for the site.

The remaining factors also militate against Behr "having charge of" the workplace, but do so only slightly. Behr may have owned some of the equipment at the site, but the contract requires Certified and Green to provide "tools and equipment" and whatever equipment Behr provided would have been under the control of Green (factor 8). In addition, Behr appears to have had some, but not a great deal of, familiarity with the construction practices and customs (factor 9). Pearson's deposition testimony indicates Butkus had enough familiarity to be able to discuss the project with him. Cromer's testimony indicates that the Behr laborers had little, if any, knowledge regarding the work they were involved in.

■ Finally, Behr can hardly be considered to have constantly participated in the work (factor 3). Butkus visited the site several times daily to check on progress but otherwise did not take part. Indeed, "[a]n owner's observations of the work to determine that he is getting what he is paying for does not make him in charge of the work." *Payne v. Village of Elwood,* 957 F.2d 517, 520 (7th Cir.1992) (quoting *Gentile v. Kehe,* 165 Ill.App.3d 802, 117 Ill.Dec. 476, 479, 520 N.E.2d 827, 830 (1st Dist.1987)). Further, the laborers Behr provided to Green were loaned employees under Green's control, *see supra.* The mere presence of a defendant's employees at the work site on a regular basis does not place the defendant in charge of the work. *Emberton,* 15 Ill.Dec. at 666, 373 N.E.2d at 1350; *Larson v. Commonwealth*

---

**3.** By this, the court does not mean to imply that only one party can "have charge of" a worksite. Illinois courts have held precisely the opposite. *See Damnjanovic,* 9 F.3d at 1276 (citing *Fitzpatrick v. Perry Drugs Co.,* 213 Ill.App.3d 529, 157 Ill.Dec. 639, 643, 572 N.E.2d 1103, 1107 (1st Dist.1991)). Instead, the court is simply illustrating Behr's lack of responsibility for safety precautions by reference to Green's active assumption of that responsibility.

*Edison Co.,* 33 Ill.2d 316, 211 N.E.2d 247, 250 (1965).

Thus, only one factor of the ten in the "having charge of" test definitively points toward Structural Work Act liability for Behr. Viewing the totality of the circumstances, *see Damnjanovic,* 9 F.3d at 1276, the strength of the basis of this factor, an unexercised contract right, is not enough in light of the bases of the other nine factors, all of which militate to at least a slight degree against Behr "having charge of" the furnace work and a majority of which definitively point that way, to raise a genuine issue of material fact that Behr "had charge of" the furnace work.[4] Behr did not "have charge of" the furnace project work site, and thus cannot be liable under the Structural Work Act. For this reason, summary judgment for Behr on Count II, the Structural Work Act claim, is appropriate.

## CONCLUSION

For the reasons stated above, Behr's motion for summary judgment is granted.

---

**4.** As the court finds the Structural Work Act does not apply to Behr because it did not "have charge of" the furnace work, the court does not address Certified's additional arguments against application of the Structural Work Act to Behr.